COMMONWEALTH vs. LOUIS C. HALL.

Suffolk.    October 7, 1974. — February 10, 1975.

Present: TAURO, C.J., REARDON, QUIRICO, HENNESSEY, & KAPLAN, JJ.

*Search and Seizure. Probable Cause. Constitutional Law,* Search
and seizure, Probable cause.

Where the only entrance to a hallway in a building owned by the ·
defendant was through a door with a lock, and where the hallway led
to only two apartments, one occupied by the defendant and one
vacant, conversations overheard by police eavesdropping in the
hallway outside the defendant's apartment could not be considered in
deciding whether there was probable cause to issue a search war-
rant. [792-795]

Where an affidavit contained sufficient information, based on a reliable
informant's tip and police observation, to establish probable cause for
issuance of a search warrant, the warrant was not made invalid
because in addition information improperly obtained by police
eavesdropping was included in a sentence at the end of the affida-
vit. [795-798]

A search warrant application which recites "certain rooms in . . . [the
second-floor apartment]" cannot be interpreted to include the third
floor of a house and it was, therefore, error to conclude that a search of
the third floor as an "extension" of the second floor was permitted
by the issuance of the warrant. [798-800]

Where following a search of a second-floor apartment pursuant to a
warrant and the arrest of its occupants, including the owners of the
building, there was no one with a right of entry either to the second-
floor apartment or to a vacant one on the third floor, where a number
of police officers were at the scene, and where the police attempted to
obtain a search warrant but were unsuccessful because of the late
hour, there were no exigent circumstances justifying a warrantless
search of the third-floor apartment. [800-804]

INDICTMENTS found and returned in the Superior Court
on November 16, 1972, and December 15, 1972.

Pre-trial motions to suppress evidence were heard by
*Linscott,* J., and the cases were heard by *Bennett,* J.

*Michael D. Cutler* for the defendant.

*Robert Snider,* Special Assistant District Attorney (*Stephen M. Needle* with him) for the Commonwealth.

KAPLAN, J. The defendant was convicted after a jury waived trial in the Superior Court on indictments for possession of cocaine with intent to distribute (G. L. c. 94C, §§ 31-32), possession of marihuana with intent to distribute (*id.*), and possession of a firearm without an identification card (G. L. c. 140, § 129C). He was sentenced to one year's imprisonment for each offense, the terms to run concurrently.

On this appeal subject to G. L. c. 278, §§ 33A-33G, the assignments of error attack the judge's failure upon voir dire to suppress the cocaine, marihuana, and firearm in question as having been seized illegally by the police. The facts brought out at voir dire were in outline these. Upon an affidavit referring to a tip, surveillance of premises, and overheard conversations, a search warrant issued on October 2, 1972, for "certain rooms in the 2nd fl apt 2nd fl of 2½ wooden dwelling house" at 22 Rosedale Street, Dorchester, a three-story building with one apartment on each floor. Under the warrant Boston police at about 10:15 P.M. that evening entered and searched the second-floor apartment, in which the defendant Hall and his wife resided, found there a small quantity of marihuana and a hand gun, and thereupon arrested the defendant's wife[1] and two other persons present. They found papers indicating that the Halls owned the building (which was the fact); also keys to the front door of the building and to the unoccupied apartment on the third-floor which was in the course of being renovated. One of the officers was called to the street and received information that there was a larger quantity of drugs in the third-floor apartment. Having tried but failed because of the late hour to make arrangements to obtain a fresh search warrant for that apartment, the police after consulting a legal advisor of the Boston police department

---

[1] The voir dire was in respect to the charges brought against Mrs. Hall as well as the defendant, but the trial proper proceeded against the defendant only, another disposition having been made of the charges against Mrs. Hall.

proceeded to search it nevertheless. Large quantities of cocaine and marihuana were found there sufficient if admissible to support the charges of "intent to distribute." The defendant appeared at the apartment with another in the early morning and was also arrested.

The judge at voir dire made findings and rulings holding that the warrant for search of the second-floor apartment was adequately supported, and validating also the search of the third-floor apartment by reading the warrant to cover that apartment as an "extension" of the second-floor apartment. He also found the search, "under all the circumstances," reasonable.

The defendant argues on this appeal, first, that all the evidence seized should have been suppressed because the affidavit on which the warrant issued was entirely invalidated by the inclusion in it of information secured through illegal eavesdropping in the hallway outside the second-floor apartment; if this illegality did not taint the entire document, then the rest was anyway insufficient to support the issuance of the warrant. Second, assuming that the warrant legalized search of the second-floor apartment and thus justified seizure of the hand gun and its reception in evidence, it could not be read to cover the third-floor apartment, and exigent circumstances did not exist that could legalize a warrantless search of that apartment; so the evidence consisting of the drugs found there should have been suppressed.

Our analysis leads us to the conclusion that the firearm was properly seized in the second-floor apartment and the conviction based thereon should be affirmed; but the seizure of the drugs in the third-floor apartment was illegal and the relevant convictions should be reversed.

1. *The valid search of the second-floor apartment.* We reproduce in the margin the text of the affidavit presented to the assistant clerk of the Municipal Court of the Dorchester District who issued the warrant.[2] It sets out

---

[2] "On September 30, 1972 Det. Linsky, Currier and Simmons received information from a reliable informant who has proved reliable in the past and has given the above officers information that has led to the arrest of (1) Little Cannabis, (2)

Commonwealth *v.* Hall.

three pieces of information: an informant's tip, observations by police officers of "suspected users and dealers of Narcotics" entering and leaving the premises, and a report of conversations in the second-floor apartment about sale and use of drugs overheard by police officers. As to the overheard conversations, it appeared at voir dire that after receiving the tip (to be described below), the police on two evenings, September 30 and October 1, maintained a surveillance of the building and also eavesdropped on the landing and stairway outside the second-floor apartment.

A word is needed here about the layout of the building. Entrance to 22 Rosedale Street is through an unlocked door into a vestibule with two doors, and three doorbells to ring the three apartments. One of the doors opens into the first-floor apartment which is not a factor in this case. The second opens on an interior staircase leading to the defendant's second-floor apartment and thence to the vacant third-floor apartment. The two doors off the downstairs vestibule are equipped with locks; the second door can be opened either with a key or by a buzzer mechanism from the upstairs apartments. That door was locked on October 2 when the police entered to execute their search under the warrant. However, on the two previous nights the police

Douglas & Tate, Cocain both arrests led to the convictions, said informant told the above officers that on Sept. 30, 1972 he was with another male who was having conversation with another male at the corner of Woodrow Avenue and Blue Hill Ave. in the Dorchester area of the city. The conversation between the males (all three of them) was relative to the sale and use of Cocaine and Cannabis. The unknown male told the informant and his friend to follow him to a house in Dorchester, the informant and his friend followed the other male who was in a cab, to 22 Rosedale St., Dorchester upon reaching this house the man in the cab got out came back to the informant's car told the informant's friend to come with him, which he did. Both males then left the informant and went into 22 Rosedale Street, Dorchester, after a period of time the informant's friend and the unknown male returned (coming from 22 Rosedale St.) to the car upon arriving at the car the unknown male told the informant that he sells good Cocaine and clean Grass and with that the informant's friend showed the informant the white powder he just bought from the unknown male, the unknown male then told the informant that if he was interested in buying some at any time to come to the second floor apartment at 22 Rosedale St., Dor. and use his friend's name. With this the informant's friend and the unknown male got in the car and drove back to Woodrow Avenue and Blue Hill Avenue. On September 30 and October 1, 1972, the above officers and other officers of the DCU did observe a number of suspected users and dealers of Narcotics enter and leave the second floor apartment at 22 Rosedale St., Dorchester. Conversation was also heard coming . . . [from] the apartment at this time. The conversation was relative to the sale and use of Cocaine and Cannabis."

managed to pass the doorway without themselves using a key or ringing a doorbell as they proceeded to the second floor to listen to the sounds coming from the apartment.[3]

The judge concluded that this police eavesdropping did not infringe upon the defendant's right of privacy, but we incline to disagree. The question cannot be answered by classifying "apartment hallway" as either a "protected" or "unprotected" area. Because "the Fourth Amendment protects people, not places," *Katz* v. *United States,* 389 U. S. 347, 351 (1967), we must rather ask what expectation of privacy could be justifiably held by one engaging in conversation inside the particular second-floor apartment. See *Warden* v. *Hayden,* 387 U. S. 294 (1967); *Texas* v. *Gonzales,* 388 F. 2d 145 (5th Cir. 1968); *Lorenzana* v. *Superior Court of Los Angeles,* 9 Cal. 3d 626 (1973). In a typical apartment building the need of each tenant for privacy competes with the fact that other tenants and their guests and business invitees, the landlord's caretaking employees, and still others, must also use such areas as hallways, stairs, lobbies, and cellars. This necessarily limits the individual tenant's ability to control access to those places, and correspondingly his expectation of privacy. Our court has held, in line with other jurisdictions, that where a common area in an apartment building is not locked off, so that anyone can enter it, a tenant cannot complain if a policeman stationing himself there overhears a conversation in the apartment. *Commonwealth* v. *Dinnall, ante,* 165 (1974). Cf. *Commonwealth* v. *Thomas,* 358 Mass. 771 (1971). For other examples, see *United States* v. *Llanes,* 398 F. 2d 880 (2d Cir. 1968), cert. den. 393 U.S. 1032 (1969); *United States* v. *Freeman,* 426 F. 2d 1351 (9th Cir. 1970); *United States* v. *Lewis,* 227 F. Supp. 433 (S. D. N. Y. 1964); *People* v. *Berutko,* 71 Cal. 2d 84 (1969). But the present case is quite different from the *Dinnall* or *Thomas* case or the like. Here only the defendant lived behind the down-

---

[3] As to the police visit on October 1, the record suggests that the door may have been unlocked. There is clearer testimony that on September 30 the police came in surreptitiously behind two persons who had rung the second-floor apartment doorbell and been admitted by the buzzer.

stairs vestibule door and off the stairway to the second and third floors. Further, he was the owner of the building, not merely a tenant. The hallway was thus in his exclusive control; he did not share its use with other tenants or with an absentee landlord; and the arrangement made — the lock on the downstairs door and the buzzer system — was designed to exclude members of the public and to admit none but the defendant's own guests and invitees.[4] See *Commonwealth* v. *Dinnall, supra,* at 167; *Commonwealth* v. *Thomas, supra,* at 773-775. A justified expectation of privacy therefore arose.[5] That the lock on the vestibule door could be and was bypassed on the two occasions when the eavesdropping took place cannot alter the picture, for police do not have carte blanche to pass through doors that are unlocked or even ajar if the area beyond has a private character. See *Commonwealth* v. *Spofford,* 343 Mass. 703, 705 (1962); *Sabbath* v. *United States,* 391 U. S. 585, 589-591 (1968); *People* v. *Haven,* 59 Cal. 2d 713, 715-717 (1963); *People* v. *Williams,* 24 App. Div. 2d (N. Y.) 274, 276 (1965).

It follows that the overheard conversations may not be considered in deciding whether there was probable cause to issue the search warrant. *Commonwealth* v. *Penta,* 361 Mass. 894 (1972). *United States* v. *Hunt,* 496 F. 2d 888 (5th Cir. 1974). But the further question for decision is whether reference to those conversations in the affidavit fatally infected the warrant, supposing that the remaining evidence provided in the affidavit was legally obtained and would itself be enough to ground a finding of probable cause. Before the recent decision in *United States* v. *Giordano,* 416 U. S. 505 (1974), the answer would surely have been no. *United States* v. *Sterling,* 369 F. 2d 799, 802 (3d Cir. 1966). *James* v. *United States,* 418 F. 2d 1150, 1151-

[4] The judge at voir dire found that the area was a "common hallway" but this was only another way of stating his conclusion of law which does not bind us.

[5] We draw support for our conclusion from those cases in which a small number of tenants share a hallway but the outer door is kept locked, and it is held that this limitation of access itself is enough to create an expectation of privacy. *United States* v. *Case,* 435 F. 2d 766 (7th Cir. 1970). *United States* v. *Blank,* 251 F. Supp. 166 (N. D. Ohio 1966). *State* v. *Di Bartolo,* 276 So. 2d 291 (La. 1973). Contra, *United States* v. *St. Clair,* 240 F. Supp. 338 (S. D. N. Y. 1965).

1152 (D. C. Cir. 1969). *Howell* v. *Cupp,* 427 F. 2d 36, 38 (9th Cir. 1970). *United States* v. *Tarrant,* 460 F. 2d 701, 703-704 (5th Cir. 1972). *United States* v. *Koonce,* 485 F. 2d 374, 379 (8th Cir. 1973). *United States* v. *Epstein,* 240 F. Supp. 80, 82 (S. D. N. Y. 1965). As the court said in the *James* case, *supra,* it can hardly be thought in such a situation that the warrant is "fruit of the poisonous tree," or that the warrant must be held void in order to effectuate a sound policy of deterring official lawlessness. 418 F. 2d at 1151-1152. But in the majority opinion in the *Giordano* case we find a discordant footnote of uncertain meaning. On a motion to suppress evidence secured by means of a court approved "pen register," it appeared that the application for the pen register had referred to certain logs of conversations illegally monitored. Speaking of the illicit logs as "a critical element" (416 U. S. at 533-534, n. 19) in the approval of the use of the pen register, the Supreme Court, without apparently overruling the *James* line of cases, held that the evidence obtained by the pen register should be suppressed. But, as the opinion dissenting on that point noted, 416 U. S. at 548 (Powell, J., concurring in part and dissenting in part), a prior application for pen register authority, not referring to the logs of the wiretapped conversations, contained enough to show probable cause on which authority for a pen register could be granted; and the information from that original, approved, application was included in the later application which that court invalidated. Perhaps, then, "critical element" is to be taken as meaning an impressive or important element in relation to the totality of material put before the court, even though the rest would independently have merited that approval.[6] This would be a curious rule, for it would appear to invite speculation about how far the mind of the magistrate was affected by the several parts of the application. Reserving doubts about the *Giordano* proposition, we now try to fit it to our case.

---

[6] Cf. *United States* v. *Nelson,* 459 F. 2d 884 (6th Cir. 1972) (two to one) (warrant may not be sustained if issuance is in doubt without the tainted evidence).

We need to decide, first, whether the evidence apart from the overheard conversations provides probable cause. The major part of that material is the informant's tip, and the defendant argues that it falls short of showing probable cause. Under *Aguilar* v. *Texas,* 378 U. S. 108, 114 (1964), there may be reliance on tips if the affidavit provides "some of the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were, and some of the underlying circumstances from which the officer concluded that the informant . . . was 'credible' or his information 'reliable' " (footnote omitted). See *Spinelli* v. *United States,* 393 U. S. 410, 415-416 (1969); *Commonwealth* v. *Stewart,* 358 Mass. 747, 750 (1971); *Commonwealth* v. *Stevens,* 362 Mass. 24, 27 (1972); *Commonwealth* v. *Kane,* 362 Mass. 656, 659 (1972); *Commonwealth* v. *Avery,* 365 Mass. 59, 62-63 (1974). Here there is a sufficient recital of prior police use of the informant to indicate that he was reliable. As to the "underlying circumstances" lending credit to his report, the affidavit tells us that the informant had a conversation about drug sales with a friend and a third person unknown to the informant; that the third person told the informant and friend to follow him to a house in Dorchester, which they did, the house being 22 Rosedale Street; that the friend and third person entered, the informant remaining outside; and that when the two emerged the third person told the informant that "he[7] sells good Cocaine and clean Grass," whereupon the friend exhibited the white powder he had just bought from the third person; and that the third person invited the informant, if he was interested in buying some, to come to the second-floor apartment and use the friend's name. The informant could thus reasonably infer on the basis of his own observations that the substance was cocaine and that it had come from the second-floor apartment. The *Aguilar* test is satisfied here, as our decisions and others ex-

[7] The Commonwealth argues from the text of the affidavit that the third person was in fact the defendant. This is possible but cannot be said to be established. We do not deem it crucial to the case.

pounding and applying *Aguilar* amply demonstrate. *Commonwealth* v. *Avery,* and *Commonwealth* v. *Stewart,* both *supra. Commonwealth* v. *Snow,* 363 Mass. 778, 782-784 (1973). See *Spinelli* v. *United States, supra,* at 416; *United States* v. *Carter,* 337 F. Supp. 604 (D. Minn. 1971), affd. sub nom. *United States* v. *Smith,* 462 F. 2d 456 (8th Cir. 1972).[8] To the tip must be added the observations by the police of suspected drug users and dealers entering and leaving the premises.[9] These lend further support to the belief that there were drugs in the second-floor apartment. See *Commonwealth* v. *Anderson,* 362 Mass. 74 (1972); *Commonwealth* v. *Duran,* 363 Mass. 229 (1973); *Commonwealth* v. *Snow, supra,* at 782-784.

Returning now to the *Giordano* point, when the foregoing evidence legally obtained is contrasted with the overheard conversations, the latter appear to be not a "critical element." This is the case not only substantively but textually, for the overheard conversations are summarized in one sentence at the end of a rather long recital giving prominence to the contents of the tip. In the *Giordano* case the application for pen register authority set out verbatim the logs of the wiretapped conversations which, because of their length and vivid detail, would be likely to impress themselves sharply on the mind of the magistrate; there is no such long recital in the text of the illegally overheard conversations here. We conclude that the warrant authorizing the search of the second floor was valid, and it follows that the hand gun conviction should be upheld.

2. *The invalid search of the third-floor apartment.* Search of the third floor is another matter. The

---

[8] The conclusion is strengthened by comparing our case with cases such as *Commonwealth* v. *Causey,* 356 Mass. 125 (1969), and *Von Utter* v. *Tulloch,* 426 F. 2d 1 (1st Cir. 1970), cert. den. 400 U. S. 826 (1970), where warrants were found to be inadequately supported; in both those cases there was no indication of how the information was obtained.

[9] The affidavit states that the suspected persons were observed entering and leaving the second-floor apartment, but as the surveillance was carried on from the street, it is likely that the affiant meant to refer to the building. But our conclusion that the warrant was good for the second-floor apartment would not change even if the surveillance evidence were excluded from consideration.

Commonwealth argues, and the judge agreed, that the third-floor apartment was only an "extension" of the second-floor apartment, and so was covered by the warrant. This argument is not persuasive. The warrant application recites "certain rooms in the 2nd fl apt 2nd fl of 2½ wooden dwelling house" and the warrant refers to the same, which seems in terms to limit the scope of search to the second floor. Evidently the police on the scene understood the warrant that way, and so, apparently, did the advisor whose opinion they sought. No one requires elegant precision of these documents, but particularity is demanded of warrants by the Fourth Amendment itself, see *Berger* v. *New York,* 388 U. S. 41, 58-59 (1967); *United States* v. *Wroblewski,* 105 F. 2d 444, 446 (7th Cir. 1939), and they are to be read without poetic license. A case resembling ours is *Keiningham* v. *United States,* 287 F. 2d 126 (D. C. Cir. 1960), where a warrant for "1106 Eighteenth Street N. W." was held not to allow search of the adjoining row house at 1108 even though the police found a door cut into the wall between the two houses and the defendants were shown to have used both as a single unit. Rejecting the contention that because of that use the warrant for 1106 should "somehow be construed" to cover 1108 as well, the court said at 129, "The authority to search is limited to the place described in the warrant and does not include additional or different places." Other cases of similar import are cited in the margin.[10] Although, as we have said, the defendant had

---

[10] *United States* v. *Kaye,* 432 F. 2d 647 (D. C. Cir. 1970) (warrant for search of store does not authorize search of upstairs apartment with separate street entrance). *United States* v. *One 1949 Buick Sedanette,* 112 F. Supp. 218 (D. Mass. 1953) (warrant for search of "first building on the left hand side" does not authorize search of third building as well). *United States* v. *Zovluck,* 274 F. Supp. 385 (S. D. N. Y. 1967) (warrant for search of hotel room does not authorize search of mail box in lobby). *State* v. *Mills,* 246 N. C. 237 (1957) (warrant for search of dwelling does not authorize search of room in adjacent house rented to same person). *Clanton* v. *State,* 59 Okla. Crim. 365 (1936) (warrant for search of service station does not authorize search of café operated by same person in separate building). See *Commonwealth* v. *Lillis,* 349 Mass. 422 (1965) (warrant for search of one apartment does not allow search of second apartment, in which different family resided, simply because occupant of first apartment occasionally visited second apartment). See also *Commonwealth* v. *Todisco,* 363 Mass. 445 (1973) (necessary particularity in description of apartment afforded by reading the warrant together with the affidavit).

a reasonable expectation of privacy in the hallway because of his control of the area leading from the vestibule door, it does not follow that a reference to "certain rooms in the 2nd fl apt 2nd fl" can be interpreted to comprise the third floor as well; rather cases like *United States* v. *Hinton,* 219 F. 2d 324 (7th Cir. 1955), apply, which hold that different apartments in a single building are as distinct as separate dwelling houses, so that a separate warrant on probable cause is ordinarily needed for each. Cases like *State* v. *Brochu,* 237 Atl. 2d 418 (Maine, 1967), in which a warrant for a private house was held to allow search of the garage also, or *Fine* v. *United States,* 207 F. 2d 324 (6th Cir. 1953), allowing such a warrant to embrace a shed in the yard, are not to the contrary; as such cases make clear, a reference to a detached single house or dwelling is commonly understood to take in the whole property, including subsidiary structures.[11]

But if the warrant is not to be read to cover the third floor, we have to turn to the question whether a warrantless search could be justified as being based on probable cause and occurring in "exigent circumstances." Probable cause can, we think, be pieced out. To the data in hand when the second-floor search was completed, including the fact that the defendant owned the building, and that keys to the vacant third-floor apartment were in the second-floor apartment, we are to add the information received by the officer called to the street. This was the officer who knew the reliable informant; he was one of five officers in the building carrying out the search. Two colleagues, stationed outside the building in an unmarked car, with commu-

---

[11] It is not intended to lay down a rule that the description in a warrant of the location and area to be searched may never be construed more liberally than in the present case. For example, the evidence when the warrant is executed may show that the illegal activities spill over into a directly adjacent or contiguous area under the same control, in which case a liberalized reading of the warrant may be proper. Thus in *United States* v. *Evans,* 320 F. 2d 482 (6th Cir. 1963) (distinguishing the *Keiningham* case, *supra,* at 483 n. 2), a search under a warrant for 1000 Baldwin Street revealed that a common wall between its attic and the attic of the adjacent building 1004 had been broken through, the connection of the 1004 attic with the lower floors of that building sealed, and the two attic areas used as one. The warrant was held to cover the attic of 1004. The record before us does not present such a case.

nication facilities to those inside and to the police station, summoned the officer downstairs by means of a walkie-talkie. The informant, waiting around the corner, told the officer that he had been trying to reach him since 6 P.M. to say that the "main stash" was in the unoccupied third-floor apartment. Someone else, said the informant, had gone between 5 and 6 P.M. to buy drugs and the defendant had gone upstairs to get them. That other person was the informant's girl friend whom the officer had met previously; she had been present on occasions when the informant had given the officer information, but she had never before supplied information. Now the officer telephoned her (the informant dialed her number) and she confirmed the informant's story. Her own reliability was unproved. Nevertheless we believe the sum total of previously available information, when combined with her story, provided probable cause for a search of the third floor. Cf. *Commonwealth* v. *Stewart,* 358 Mass. 747 (1971); *Commonwealth* v. *Snow,* 363 Mass. 778 (1973).

The police now sought advice from the assistant to the departmental legal advisor as to what to do about the third floor. He advised them to get a fresh warrant, otherwise to call him again. The police telephoned a number of clerks of the Municipal Court of the Dorchester District but evidently reached but one, who said he had no key to the court house. We may accept the judge's finding that the police acted diligently in seeking a warrant, although they were aware that on other occasions warrants had been issued by clerks from their homes. Responding to a further call — it was now near midnight — the assistant legal advisor told the police they could enter the third-floor apartment with the Halls' key. They did so and found the cocaine and marihuana.

In our opinion the commendable effort of the police to stay within the law did not succeed, as the circumstances cannot be held "exigent." Supreme Court authority from *Johnson* v. *United States,* 333 U. S. 10 (1948), to *Vale* v. *Louisiana,* 399 U. S. 30 (1970), establishes strict standards as to exigency, and the burden of showing it is on the

Commonwealth. *Vale* v. *Louisiana, supra,* at 34. *McDon-
ald* v. *United States,* 335 U. S. 451, 456 (1948). Cf. *Com-
monwealth* v. *Antobenedetto, ante,* 51 (1974). In the *Vale*
case the court refused to validate a warrantless search of a
house following an arrest in front of the house; the fact that
narcotics in the house could be easily removed, hidden, or
destroyed was irrelevant since the police knew there was no
one inside the house. Just so in the present case it appeared
at voir dire that the police knew there was no one in the
third-floor apartment. In the *Vale* case, to be sure, the
majority of the court may have been somewhat affected by
their belief that the police could have obtained a search
warrant before they went to make the arrest,[12] but in the
*Johnson* case there was no prior opportunity, yet the court
reached the same result: the warrantless search of a hotel
room, based on the detection of the odor of opium from
outside, was held illegal because it was not shown that the
evidence was threatened with removal or destruction. Even
if we assume a requirement of a "threat" of destruction or
removal, as in the *Johnson* case, 333 U. S. at 15,[13] instead of
the possibly tighter requirement, suggested by the more
recent *Vale* case, that the goods be "in the process of
destruction," or "about to be removed from the jurisdic-
tion," 399 U. S. at 35, the search here still does not fit the
"exigent" category, for in the cases held "exigent" a quite
specific threat has been found: "based on the surrounding
circumstances or the information at hand" it is reasonably
concluded that "the evidence will be destroyed or removed
before . . . [the police] can secure a search warrant." *United
States* v. *Rubin,* 474 F. 2d 262, 268 (3d Cir. 1973). The
proposition is exemplified in many situations.[14] In our case

---

[12] The assumption is questioned by Mr. Justice Black in dissent, 399 U. S. at 40 (1970).

[13] See *United States* v. *Rubin,* 474 F. 2d 262 (3d Cir. 1973); *United States* v. *Blake,* 484 F. 2d 50 (8th Cir. 1973).

[14] For example, in the *Rubin* case, suspects were inside the building in question, and the police were aware of a specific attempt by someone outside to warn them of their peril. See also *Ker* v. *California,* 374 U. S. 23, 42 (1963) (occupant of apartment might distribute or hide drugs); *Theobald* v. *United States,* 371 F. 2d 769 (9th Cir. 1967) (people inside the room might destroy the evidence); *Dorman*

Commonwealth *v.* Hall.

the evidence could be destroyed or removed only if some-
one, not on the premises, returned and managed to get into
the third-floor apartment. That such a possibility by itself
is not enough to establish exigent circumstances is clear
from the *Vale* case and other decisions.[15] A number of
police officers were on hand; they could readily have
maintained a presence to prevent suspicious access to the
premises until a warrant could be obtained.[16] *United States*
v. *Goldenstein, United States* v. *Nelson, United States* v.
*One 1949 Buick Sedanette,* and *United States* v. *Costa,* all
*supra.* See Note, Police Practices and the Threatened
Destruction of Tangible Evidence, 84 Harv. L. Rev. 1465,
1474-1476 (1971).[17] To avoid intrusion on any privacy, the

v. *United States,* 435 F. 2d 385 (D. C. Cir. 1970) (armed fugitive believed to be
inside residence); *United States* v. *Bradley,* 455 F. 2d 1181 (1st Cir. 1972)
(suspects in the midst of a narcotics transaction); *United States* v. *Davis,* 461
F. 2d 1026 (3d Cir. 1972) (suspects in dwelling in the midst of cutting heroin
preparatory to going out on the street with it); *United States* v. *Evans,* 481 F. 2d
990 (9th Cir. 1973) (specific risk that a suspect would get a warning and act to
destroy evidence); *State* v. *Patterson,* 192 Neb. 308 (1974) (suspects inside, and
attempts to arrest as they left singly could alert those inside).

[15] See *United States* v. *Goldenstein,* 456 F. 2d 1006, 1010 (8th Cir. 1972); *United
States* v. *Nelson,* 459 F. 2d 884, 887 (6th Cir. 1972); *United States* v. *One 1949
Buick Sedanette,* 112 F. Supp. 218, 221 (D. Mass. 1953); *United States* v. *Costa,*
356 F. Supp. 606 (D. D. C. 1973). Cf. *United States* v. *Small,* 297 F. Supp. 582 (D.
Mass. 1969) (lock changed on storage locker so owner could not remove drugs
inside).

The strictness with which courts construe the exigent circumstances exception
is emphasized by cases in which warrantless searches are held to be invalid
despite the presence of people inside the dwelling in question, either because no
evidence was presented to suggest that they were aware of any imminent raid, see
*Ludlow* v. *State,* 262 Ind. 266 (1974), or because though they were related to the
suspect, it was not claimed that they themselves engaged in criminal activity. See
*United States* v. *Carignan,* 286 F. Supp. 284 (D. Mass. 1967) (mother at home);
*United States* v. *Wilcox,* 357 F. Supp. 514 (E. D. Pa. 1973) (estranged wife at
home).

[16] Compare *Commonwealth* v. *Haefeli,* 361 Mass. 271, 281 (1972), which allowed
search of an automobile where the trial judge found that only one officer was on
the scene who could not both return for a search warrant and watch the
automobile to prevent its removal.

We are far from saying that exigent circumstances cannot be found where more
than one officer is on the scene; the decision will always depend on an evaluation
of all the circumstances. Cf. *United States* v. *Pino,* 431 F. 2d 1043 (2d Cir. 1970),
which found an immediate warrantless search of an apartment justified when two
officers arrested two men at 1 A.M., citing the possible danger of leaving a single
officer to guard the site for an extended time until a warrant could be obtained.

[17] The leeway now allowed the police to conduct immediate searches of auto-
mobiles in lieu of holding them pending a warrant, see *Commonwealth* v. *Rand,*
363 Mass. 554 (1973); *Commonwealth* v. *Miller, ante,* 387, 389 (1974), is based

police could have retreated to the vestibule. And since those present in the second-floor apartment had already been arrested, and on the basis of evidence found there the police had grounds and intended to and did in fact arrest the defendant when he appeared, there was no one with a cognizable right of entry into the premises who could complain of its curtailment by the police. See Note, *supra,* at 1471-1481.

The delay facing the police before they could obtain a warrant was not one or two hours but perhaps as much as eight hours, but the cases do not suggest that the result should turn on such measurements of time; rather the question is whether the longer delay introduces a substantially greater risk of loss or destruction of evidence or of harm to the police.[18] No such showing of increased risk was made here. It is significant that the police did not balk at waiting the length of time needed to apply for and secure a fresh warrant if a court clerk were available. There was no showing that the police feared the appearance during the longer period of confederates bent on preventing seizure of a possible cache in the third-floor apartment or threatening or attacking the police; had any associates of the Halls appeared, they could, as noted, have been denied entrance. The Commonwealth on all the facts thus failed to meet its burden of showing exigency, and the third-floor search must be held illegal.

> *Judgment of conviction for possession of firearm affirmed; other judgments reversed and findings set aside.*

---

on Supreme Court cases emphasizing the special nature of automobiles and the lesser expectation of privacy one may have with respect to them. See *Cardwell* v. *Lewis,* 417 U. S. 583, 590-591 (1974); *Chambers* v. *Maroney,* 399 U. S. 42, 48, 52 (1970). There is therefore no basis for automatically extending an automobile rule to cover dwelling searches, see *Chambers* v. *Maroney, supra,* at 52, and the *Vale* line of cases makes clear that it should not be so extended.

[18] See *United States* v. *Rubin,* 474 F. 2d at 268 (3d Cir. 1973).