Ford, J.
The defendant, who is charged with two counts of murder along with several other related crimes, moves to suppress evidence seized by Great Barrington police officers from his dormitory room at Simon’s Rock College on December 14 and December 15, 1992. A hearing on the defendant’s Motion was held before me on August 13, 1993. At that hearing, I heard testimony from Officers Mark Stannard and Merritt Heady of the Great Barrington police, as well as from Christopher Lucht, a Residence Director at the College. In addition, onAugust 16, 1993,1 took a view of the subject premises with counsel. Based upon that view, the exhibits, the testimony of the witnesses, and the reasonable inferences drawn therefrom, I find the facts to be as follows.
FINDINGS OF FACT
1. On December 14, 1992, at approximately 10:20 p.m., Officer Mark Stannard (hereafter “Stannard"), was on duty and received a radio report concerning a subject with a firearm at Simon’s Rock College. Stannard drove immediately to the college. Upon arrival at the security shack located at the entrance to the campus, he observed a motor vehicle with its front wheel in a snow bank. He then observed a person inside that vehicle with what appeared to be a gunshot woimd to his left temple. Inside the security shack, Stannard observed a female security guard who appeared to be suffering from gunshot wounds. The female security guard said to Stannard that the defendant had shot her. Stannard also heard a series of gunshots, one after another, coming from the area of the campus. Other officers arrived upon the scene, and they, along with Stannard, began to move onto the campus.
2. A short time later, the officers received a radio transmission from Officer Larkin who was at the police station. Officer Larkin indicated to them that the person doing the shooting was on the telephone. The shooter (later identified as the defendant) said to Officer Larkin that he was at the Student Union, and that he wanted to give himself up. Accordingly, the officers went to the Student Union, and advised Officer Larkin to tell the subject to come out of the building. A few moments later, the defendant emerged from the building, with his hands at his side, and was immediately placed under arrest. He was advised of his Miranda rights, and transported to the police station.
3. Officer Larkin had told the defendant to leave the phone off the hook when he left the Student Union, and the defendant complied. After the defendant was taken into custody, Stannard and Officer Louis Sinico entered the Student Union and saw the phone dangling. They also observed a gun and a knapsack on the floor. The officers satisfied themselves that there was no one else in the Student Union. Accordingly, they left the building, with the gun and the knapsack still inside.
4. Before the defendant was removed from the scene, but after he had been advised of his Miranda rights, Officer Merritt Heady (hereafter “Heady”) said to him, “We can’t be fooling around here. We have to know what buildings you shot in." The defendant responded that he had shot at the guard shack, the library, Dolliver House, and Kendrick House.
5. At that point, the main concern of the officers was to locate and care for any wounded individuals, as well as to secure the scene. The first building they visited was Dolliver House. Upon entering Dolliver House, the officers saw blood on the floor. They followed the trail of blood and, with the assistance of students who directed them, they found two wounded individuals in residence rooms inside that dormitory. The police knocked on the doors of all the rooms in Dolliver House, and looked inside any rooms the doors of which were open. The only rooms they actually entered were rooms in which the two wounded individuals were found. If the door to any room was locked, the police did not attempt to open that door or to look inside that room.
6. The police also went to Crosby House, where they entered every room they could. They also looked inside the closets and the bathrooms of those rooms. However, they did not move any beds or disturb any furniture in those rooms.
7. Finally, the police went to Kendrick House. Upon their arrival at Kendrick House, two students said that they had been shot at, but that they had not been hit. The students also said that there were no wounded in Kendrick House. The police also learned that the defendant’s room was in Kendrick House, and it was pointed out to them by students as room A2. The officers were told that it was a single room, and that the defendant lived in that room by himself. The police checked the door to that room and found that it was locked. The students said nothing to the police about anyone going into or out of the defendant’s room prior to the shooting. In addition, no one said that any gunshots had been heard coming from the defendant’s room at any time.
8. Nevertheless, the police decided to search the defendant’s room. The stated rationale for that decision was that they wanted to be sure that there were no wounded persons or accomplices in the defendant’s room, and that there were no weapons hidden therein. Accordingly, the police asked for a Residence Director to come to Kendrick House, and to open the door to the defendant’s room with a master key. Christopher Lucht, one of the college’s Residence Directors, felt that he had the authority to open the defendant’s room for the police under these circumstances, and did so. At the time that *188 the police went into the defendant’s room, they had been on campus for approximately 30 to 40 minutes, and the defendant had been in custody for approximately 15 minutes. No shots had been heard since just prior to the time that Officer Larkin radioed the officers and informed them that the defendant wanted to give himself up.
9. Room A2 is an extremely small room. When the officers opened the door, they found that the lights were on. They were able to see all areas in the room from the threshold, except a closet. The door to the closet is located immediately to the left as one enters the room, and it could be opened by taking one step into the room, closing the door which separates the room from the hallway, and then opening the closet door. I find that it would have been obvious from the threshold that there was no one in the room. There was no blood, either in the hallway outside the room or on the floor of the room itself. It was not necessary to enter the room and remove any suitcases from underneath the bed in order to ascertain whether there were any human bodies under the bed; that determination could have been made from the threshold. In addition, any objects or papers on the desk in the room would not have been observable from the threshold.
10. Despite the fact that it was obvious from the threshold that there were no wounded persons or accomplices in the defendant’s room, the police chose to enter that room. They then pulled two suitcases out from underneath the bed, and observed a long cardboard box. They picked up the box, put it on the bed, and opened it. Inside the box, they observed a number of objects, including a stock, a sale slip, several boxes of shells, and various papers. The police then looked around the room, and examined a number of papers and drawings on the defendant’s desk. In addition, they opened drawers in the desk, and rummaged through them. They examined a plane ticket, which was inside a folded airline ticket jacket lying on the desk, and made note of the defendant’s purported departure date from the area. Because those items appeared to the police to be incriminating, the officers seized the items and retained them as evidence.
11. The only room which Heady searched in Kendrick House was that of the defendant.
12. On December 15, 1992, Trooper Steven DelNegro of the Massachusetts State Police applied for a search warrant to search the defendant’s room. In his affidavit in support of the application, Trooper DelNegro referred to the fact that Great Barrington officers had already searched the room. He set forth in detail what they had already seized and what they observed. Based upon that, the warrant was issued, and a search pursuant to that warrant occurred at approximately 2:00 p.m. on that day. A number of items were seized.
RULINGS OF LAW AND DISCUSSION
1.Prior to determining whether the police complied with the warrant requirement of the Fourth Amendment to the United States Constitution and Article Fourteen of the Massachusetts Constitution, an initial determination must be made as to whether a search, implicating those constitutional provisions, has occurred. See Commonwealth v. Ortiz, 376 Mass. 349, 351-53 (1978). The primary analysis applied in answering this question is whether the police intruded into an area in which the defendant had a constitutionally protected reasonable expectation of privacy. Commonwealth v. Podgurski, 386 Mass. 385, 387 (1982). The test used in determining whether a particular defendant has a reasonable expectation of privacy is two-pronged. The first prong is whether the defendant had a subjective expectation of privacy, and the second is whether society is willing to recognize that expectation as reasonable, justifiable, and legitimate. Commonwealth v. Panetti, 406 Mass. 230, 231-32 (1989). The Fourth Amendment has been expanded beyond “houses” to include apartments, hotel rooms, and other living quarters. Stoner v. California, 376 U.S. 483 (1964); United States v. Jeffers, 342 U.S. 48 (1951). I conclude that a college dormitory room is analogous to an apartment or a hotel room. “It certainly offers its occupant a more reasonable expectation of freedom from governmental intrusion than does a public telephone booth.” Commonwealth v. McCloskey, 217 Pa. Super. 432, 272 A.2d 271, 273 (1970). A student’s “dormitory room is his house and home for all practical purposes, and he has the same interests in the privacy of his room as any adult has in the privacy of his home, dwelling, or lodging.” Smyth v. Lubbers, 398 F.Supp. 777, 786 (W.D.Mich. 1975). I rule that the defendant had a reasonable expectation of privacy in his dormitory room, and that he has met his burden of establishing that a search in the constitutional sense did occur.[1]
2. Warrantless searches are per se unreasonable unless they fall within one of the few narrowly drawn exceptions to the warrant requirement. Katz v. United States, 389 U.S. 347, 357 (1967); Commonwealth v. Forde, 367 Mass. 798, 800 (1975). When a warrantless search is conducted, the Commonwealth has the burden of showing that the search, and any resulting seizure, falls within the narrow class of permissive exceptions. Commonwealth v. Franklin, 376 Mass. 885, 898 (1978).
3. A warrantless entry may be made into a defendant’s dwelling for the purpose of a search if exigent circumstances exist making it impracticable to obtain a warrant. Commonwealth v. Bradshaw, 385 Mass. 244, 254 (1982). Authority from the United States Supreme Court establishes strict standards as to exigency, and the burden of showing it is on the Commonwealth. Commonwealth v. Hall 366 Mass. 790, 801-02 (1975). When, for example, the police had probable cause to believe that a human body was in the trunk of a motor vehicle, the circumstances were deemed exigent because prompt investigation of such a report was required. Commonwealth v. Ghee, 414 Mass. 313, 317 (1993). Other factors which may be considered in determining whether exigent circumstances exist are: *189 1) a showing that the crime was one of violence or that the suspect was armed; 2) a clear demonstration of probable cause; 3) strong reason to believe that the suspect was in the dwelling; 4) whether a likelihood exists that the suspect could escape if not apprehended; 5) whether the entry was made peaceably and in the daytime; 6) a likelihood that the delay attendant upon securing a warrant would facilitate the destruction of evidence; and 7} some showing of a reasonable basis for believing that delay would subject the officers or others to physical harm. Commonwealth v. Viriyahiranpaiboon, 412 Mass. 224, 227 (1992); Commonwealth v. DiSanto, 8 Mass.App.Ct. 694, 700 (1979). These factors, however, are to be considered merely as guidelines for the resolution of the question, as each case turns on an analysis of all pertinent facts. Commonwealth v. Hamilton, 24 Mass.App.Ct. 290, 293 (1987).
4. In this case, I rule that the Commonwealth has failed to meet its burden of establishing exigency. At the time of the search, the defendant had been in police custody for approximately 15 minutes; at that point, the defendant was clearly not armed and dangerous, and there was no reason to believe that he would escape if the search were not conducted promptly. Similarly, there was no reason to believe that the delay attendant upon securing a search warrant would have facilitated the destruction of evidence. Although the police now say otherwise, I conclude that their actions on the night in question establish that there was no reasonable basis for believing that any delay in performing a search of the defendant’s room would have subjected the officers, students, or members of the public to physical harm. There was absolutely no reason to believe that an accomplice might be hiding in the defendant’s room. If the police had truly believed that, it is doubtful that they would have summoned a Residence Director and asked him to unlock the door by standing directly in front of it, where he would have been a perfect target for a gunman lurking in the room. No student had told the police that there was a second shooter, and the shots had stopped just before the defendant was taken into custody. In addition, there was no reason to believe that any wounded individuals were in need of immediate attention in the defendant’s room. The students had already told the police that no one had been hit in Kendrick House, that no one had gone into or out of the defendant’s room just prior to the shootings, and that no shots had been heard from inside the defendant’s room. In addition, the police observed no blood either outside or inside the defendant’s room. Under these circumstances, a complete search of the defendant’s room was unjustified.
5. Alternatively, I shall assume for the sake of argument that the situation was sufficiently exigent so that the police at least had the right, if not the duty, to open the door to the defendant’s room and satisfy themselves that there were no victims or other suspects therein.[2] However, any exigency which may have existed ended as
soon as the “victim-or-suspect” search had been completed. Commonwealth v. Lewin (No.1), 407 Mass. 617, 624 (1990), citing Thompson v. Louisiana, 469 U.S. 17, 22 (1984). In this case, the “victim-or-suspect” search had been completed as soon as the officers opened the door to the defendant’s room, looked inside the closet, and determined (or reasonably should have determined) that the room was empty. After that point, the circumstances were no longer exigent, at least vis-a-vis the defendant’s room. Ihe subsequent search of the room far exceeded the scope of a “protective sweep” to determine whether there were any victims or accomplices located in the defendant’s room. See Maryland v. Buie, 494 U.S. 325 (1990). There was clearly no justifiable reason for pulling suitcases out from underneath the bed, seizing and opening the gun box, opening drawers in the defendant’s desk, opening the airline ticket jacket, and rummaging through the defendant’s papers. At that point, the police were clearly searching for evidence to be used against the defendant in the nascent criminal prosecution, and I rule that their claim that they were searching for victims and/or accomplices is pretextual.[3]
6. In addition, I rule that the police cannot justify this search as exigent on the theory that they were searching for weapons. Because the defendant was in custody, and because he lived in room A2 by himself, there was absolutely no reason to believe that any evidence in the room would be destroyed or removed before the police could secure a search warrant. The mere possibility that some individual might somehow manage to get into the defendant’s locked room and remove or destroy evidence is clearly not enough to establish exigent circumstances. Commonwealth v. Hall, 366 Mass. 790, 802-03 (1975). “A number of police officers were on hand; they could readily have maintained a presence to prevent suspicious access to the premises until a warrant could be obtained.”[4] Id. at 803. It is clear that securing a dwelling to prevent the destruction or removal of evidence while a search warrant is being sought is not itself an unreasonable seizure of the dwelling or its contents. Police officers may secure an area to be searched before a warrant is procured as long as the search does not commence before issuance of the warrant. Commonwealth v. Blake, 413 Mass. 823, 829-30 (1992). I believe that the police should have done exactly that, and that their search of the defendant’s room, in the absence of exigent circumstances, was improper. Accordingly, the articles seized therein must be suppressed.
7. The Commonwealth further argues that, even if the warrantless search was improper, the evidence should not be suppressed because it would have been discovered and seized pursuant to the search warrant which was executed the following afternoon. In making this argument, the Commonwealth relies upon the inevitable discovery doctrine. Both the United States Supreme Court and the Supreme Judicial Court have recognized an inevitable discovery exception to the exclusionary rule. Nix v. Williams, 467 U.S. 431 (1984); Commonwealth v. O'Connor, 406 Mass. 112 *190 (1989). However, it is abundantly clear that the Supreme Judicial Court has “declined to apply an inevitable discovery rule to justify admission of evidence seized in violation of the requirement that a search warrant be obtained, even if it was inevitable that, if sought, a search warrant would have been issued and the evidence would have been found.” Commonwealth v. O’Connor, supra at 118. The purpose of the exclusionary rule is to deter unconstitutional shortcuts; therefore, the inevitable discovery rule will not be applied where the police have acted simply to accelerate the discovery of evidence in question. Id. n.5. Simply put, “In this state that rule does not apply where a search warrant should have been obtained but was not. . .” Commonwealth v. Ghee, 414 Mass. 313, 316 n.4 (1993). Because I conclude that the police should have obtained a search warrant before searching the defendant’s room, I rule that the inevitable discovery doctrine does not assist the Commonwealth in avoiding suppression of evidence illegally seized.
8. Any illegally obtained evidence may not be considered in determining whether there is probable cause to issue a search warrant. Commonwealth v. Hall, 366 Mass. at 795. Here, Trooper DelNegro’s affidavit in support of his application for a search warrant contained no information setting forth probable cause to search the defendant’s room, except what he was told by the Great Barrington officers who had already searched the room improperly. If that paragraph is excised, as it must be, the affidavit does not set forth probable cause to support the issuance of the warrant. Accordingly, the search warrant is plainly deficient on its face. All evidence seized pursuant to that warrant constitutes the “fruit of the poisonous tree,” and it must be suppressed as well. Wong Sun v. United States, 371 U.S. 471 (1963).
ORDER
For the foregoing reasons, it is the ORDER of this court that the defendant’s Motion to Suppress Evidence shall be, and the same hereby is, ALLOWED.

 The fact that college officials reserved the right to enter students' rooms for some purposes does not mean that the defendant was not entitled to have a reasonable expectation of freedom from governmental intrusion. Nor does it mean that the defendant implicitly consented to a search by police, or that he gave college officials the authority to consent to such a search. See Chapman v. United States, 365 U.S. 610, 616-17 (1961); Commonwealth v. McCloskey, 272 A.2d at 273. The actions of the police in this case must be measured against the federal and state Constitutions, not the Simons Rock Student Handbook.

 The law is clear that officers may conduct a security check without a warrant when they reasonably fear that other persons are lurking within who may pose a threat to their safety or who may need their immediate assistance. See Commonwealth v. Lewin (No.1), 407 Mass. 617, 624 (1990), citing United States v. Escobar, 805 F.2d 68, 71 (2d Cir. 1986). For the reasons already set forth herein, I question whether any such fear that the police may have had was reasonable.

 I would note that G.L.c. 38, §6 provides: “The District Attorney and his law enforcement representative, upon receipt of notification of the death, shall thereafter be the authority to direct and control the criminal investigation of the death and shall coordinate the criminal investigation with the police within whose jurisdiction the death occurred. The police shall forthwith notify the District Attorney or his law enforcement representative of such death.” From the evidence presented to me in this case, it would appear that the Great Barrington police took the extremely important step of searching the defendant’s room without even consulting with the District Attorney or his law enforcement representative (the Crime Prevention and Control Unit of the Massachusetts State Police), and acted without the benefit of their advice. I am convinced that, if they had been consulted, the District Attorney and his First Assistant, both of whom have an extensive knowledge of the law and a high regard for the rights of the accused, would have advised the police to obtain a search warrant. I note that Trooper DelNegro, an experienced homicide investigator with extensive training in the field, immediately recognized the need for a search warrant and did in fact obtain one. However, he was unable to “put the genie back in the bottle” or undo that which had already been done. Unfortunately for the Commonwealth, under these circumstances the law requires suppression of potentially important evidence.

 The Commonwealth claims that there was an inadequate number of officers on the scene to permit the “luxury” of posting an officer outside the defendant’s room while a warrant was being obtained. With all due respect to the opinions of the officers involved, I reject that argument. I note that after he finished the search of the defendant’s room, Heady searched no other rooms in Kendrick House. There was insufficient evidence provided at the hearing as to what matters required the immediate attention of all the officers after the search of the defendant’s room, so that they were unable to post even one officer as a guard outside the room. Finally, if the problem were truly a shortage of officers, the Great Barrington police could have, and I believe should have, notified the State Police, who certainly could have provided as much manpower as was necessary.