Toomey, J.
INTRODUCTION
Defendants have each been accused, by Bristol County indictments, of Trafficking in a Class A controlled substance and Conspiracy to violate the controlled substance law. Contending that evidence of their guilt was obtained by the police via alleged violation of their federal and state constitutional rights, defendants have now moved to exclude that evidence from presentation at their trials.
More particularly, defendant Batista claims that the seizure of heroin from the rear seat of his motor vehicle after the vehicle had been stopped by the police without probable cause violated the Fourth and Fourteenth Amendments to the United States Constitution. He also asserts that an incriminating statement he uttered was the product of police interrogation effected in violation of the Fifth and Sixth Amendments to the United States Constitution.
Defendant Sornoza seeks suppression of a large amount of cash,, thought to be payment for Batista’s intended delivery of heroin, on the ground that the stop, search and seizure of his motor vehicle lacked probable cause. The search, and an incidental interrogation, are, he argues, contrary to the Federal and Commonwealth Constitutions.
For the reasons stated infra, Batista’s motion to suppress items seized and Sornoza’s motion to suppress items seized will be denied. Batista’s motion to suppress evidence of his statements to the police will be allowed, but Sornoza’s motion to suppress his statements will be denied.
FINDINGS OF FACT
1. On October 23, 1998, Swansea Police Detective Furtado received information from an anonymous informant. That information recited that:
a. Batista would drive, in a Lincoln, Jeep or Honda, along Route 6 to a parking lot in Swansea where a Burger King and a McDonald’s restaurants are situated. There, a transaction in heroin would occur in which Batista would sell four to six “brownies”[1] for $200 each. The heroin would be delivered by Batista to the buyer in a Burger King bag.
b. Before Batista would deliver the “brownies,” an associate, operating an Infiniti, would accept from the buyer the payment for the heroin. The Infmiti’s operator would be an hispanic male. Communication between Batista and the cash pick up vehicle would be accomplished by cell phone and pager.
c. All vehicles would bear Rhode Island license plates.
d. The informant added that he was present when “brownies” were recently delivered to a buyer at the Swansea McDonald’s.
2. On October 26, 1998, Detective Furtado was apprised by Fall River Detective Paul that an informant, at 8:05 AM that morning, had told Paul that:
*557 a. A black Infiniti would arrive at the McDonald’s parking lot that day and its operator, an hispanic male, would receive from one “Jamie,” a white female in a red Honda with Florida license plates, money for the purchase of heroin.
b. The heroin was to be delivered to Jamie by Batista, whose street name was “Pablo,” in a Burger King bag at the Burger King site after she had paid the hispanic male in the McDonald’s lot.
c. Batista had delivered heroin to Fall River in the past and used multiple motor vehicles, including a Honda, in the exchanges. Batista had been arrested in Fall River, but, upon his release, he resumed his involvement in drug distribution, delivering heroin to the Burger King site in Swansea and to a location in Seekonk.
3. At about 10:00 AM on October 26, 1998, the Swansea and Fall River officers met and all were outfitted with Swansea radios. The Swansea and Fall River officers exchanged information gleaned from the informants. The group then proceeded to the Swansea parking lot.[2] Detective Furtado positioned his unmarked cruiser in the vicinity of the McDonalds; Detective Paul and other Fall River officers were located near the Burger King.
4. From his surveillance location on Route 6, Detective Paul, at about 11:00 AM, observed a black Infiniti enter and, within one minute, leave the Burger King lot. The Infiniti proceeded east to the McDonald’s lot where Detective Furtado was positioned.
5. Detective Furtado, at about 11:00 AM, saw a black Infiniti, with Rhode Island license plates, moving in the McDonald’s parking area. The Infiniti was operated by an hispanic male (later identified as Sornoza) who drove through the lot, scanning the area. As the Infiniti passed Furtado’s position, the Detective engaged his cruiser and followed the Infiniti as it circled the lot.
6. Shortly thereafter, Paul saw a blue Honda approach on Route 6 from the west, enter the Burger King lot, place an order at the drive-up window and drive to the pick-up window. Detective Paul made a radio call to Detective Furtado urging him to participate in the stop of the Honda. Abandoning his “tail” of the Infiniti — which was, at the time of the radio transmission, seen by Furtado to enter a parking space beside a red Honda operated by a white female— Furtado sped to the Burger King site. As Paul’s unmarked cruiser approached the blue Honda from the front, its operator, recognized by Paul as Batista,[3] put the Honda in reverse and slammed into a vehicle waiting behind the Honda at the pick-up window.[4] Effectively hemmed in, Batista complied with Paul’s order to extend his hands through the Honda’s window for handcuffing.
7. Having been thus secured, Batista was interrogated. Paul asked him where the controlled substances were located. Batista replied, “On the backseat.” The police found and seized, from the back floor of the Honda, 750 bags of heroin. By this time Detective Furtado had arrived from the McDonald’s lot.
8. While in the vicinity of the blue Honda, Detective Furtado saw the black Infiniti proceed west on Route 6, decelerate, activate its directional light signalling an entry into the Burger King lot, but suddenly continue west on Route 6. The police approach, in marked cruisers,[5] toward the blue Honda was in open view of the black Infiniti on Route 6. Paul told Furtado that he (Paul) had seen the Infiniti in the Burger King lot before the Honda had arrived. Furtado dispatched Officer Garvin to stop the Infiniti. The stop was effected by Garvin about Vs mile beyond the Burger King.
9. Detective Paul left the Burger King site and joined Officer Garvin to attend to the Infiniti and its operator. Paul approached the vehicle, searched the interior and seized two large packets of currency from the pockets of a jacket on the rear seat. Furtado arrived, having directed that Batista be removed to the Swansea police station for booking, and inquired of Sornoza as to his presence at the scene. Sornoza responded variously that he had dropped off his girlfriend at the Firestone Store and that he had been watching for her at the McDonald’s site. Paul delivered the currency to Furtado.
DISCUSSION
A. Motion to Suppress Items Seized From the Honda
The anonymous informants upon whom Detectives Paul and Furtado relied were not shown to have been reliable and, apart from the relative detail of their information, the mutual corroboration of their assertions and one informant’s claim that he/she was present “recently” at “brownie” deliveries, the source of their knowledge is not satisfactorily demonstrated. Nevertheless, the police observations at the McD-onalds and Burger King sites tracked the informants’ information in every pertinent respect and validated that information. The sum of the knowledge possessed by Detectives Furtado and Paul constituted probable cause to believe that evidence of a crime, to wit, unlawful distribution of controlled substances, would be found in the blue Honda and the black Infiniti. Furthermore, because probable cause was not extant until the police observations at the scene and because of the inherent mobility of the motor vehicles as to which probable cause attached, exigent circumstances prevailed, a warrant was not required and the summary stop and search of the vehicles was lawful. Pennsylvania v. Labron, 518 US 938 (1996); Commonwealth v. Motta, 424 Mass. 117, 124 (1997).
That Batista’s acknowledgment of controlled substances in the vehicle was Miranda violative, see Section C, infra, does not illegitimize the search because the police had an abundance of probable cause to conduct the search irrespective of the acknowledg *558 ment. See Commonwealth v. Hall, 366 Mass. 790 (1975). Additionally, the seizures at bar were inevitable under the circumstances and the police inquiry, while improper, was not egregious or undertaken in bad faith so as to render inapplicable the “inevitable discovery” rule. See generally, Smith, Criminal Practice and Procedure, 30 Mass. Prac., §1332 (1999), and cases cited. The determination to search and the execution of the search were thus not fruits of a tree poisoned by the Miranda failing.
B. Motion to Suppress Items Seized From the Infiniti and Statements by Sornoza
For the reasons expressed in Section A, supra, relative to probable cause and exigent circumstances in connection with the Honda, the warrantless stop and search of the Infiniti and seizure of currency from the pocket of the jacket in the vehicle were lawful. Furthermore, defendant Sornoza’s comments, the evasive quality of which may be taken to have been an expression of a consciousness of guilt, were not, as defendant contends, the product of an unlawful stop and search because, as noted, the stop and search were eminently lawful.[6]
C. Motion to Suppress Statements by Batista
Defendant, whose Honda had been “boxed” by a police vehicle, was hand-cuffed and in the company of a number of police officers, at least one of whom had drawn his firearm. It is indisputable, therefore that his freedom of motion was substantially, if not wholly, curtailed. Notwithstanding police testimony that he was not under arrest, see Commonwealth v. Morse, 427 Mass. 117 (1998), his circumstances were decidedly custodial. Stansbury v. California, 511 US 318 (1994); Commonwealth v. Vinnie, 428 Mass. 161 (1998); Commonwealth v. A Juvenile, 402 Mass. 275 (1988). The inquiry by Detective Furtado as to the whereabouts of the drugs was doubtless an interrogation and closed the circle for this Court’s conclusion that a custodial interrogation had indeed occurred. It is black letter law that the requirements of Miranda v. Arizona, 384 US 436 (1966), must be satisfied before the product of a custodial interrogation may be received into evidence. Id., at 476. Because, at bar, Batista’s answer to an inquiry made by Detective Furtado in the course of a custodial interrogation was not legitimized by a recitation of the Miranda warnings and waiver, the answer will not be admissible at trial.
CONCLUSION
1. The motion to suppress the items seized during the search of the Honda is DENIED.
2. The motion to suppress the items seized during the search of the Infiniti is DENIED.
3. The motion to suppress the statement of Sornoza as a product of an unlawful stop and search of the Infiniti is DENIED.
4. The motion to suppress the statement of Batista as in violation of Miranda is ALLOWED.
Daniel F. Toomey

 “Brownie" is a slang expression for a quantity of heroin.

 The Burger King restaurant and the McDonald’s restaurant were located about l/4 mile apart on Route 6 in Swansea; the former was to the west of the latter.

 Paul was familiar with Batista as a result of Paul’s investigation in a 1997 controlled substance case.

 The vehicle was not involved in the police operation and its operator likely was quite surprised at this effort to give new meaning to the Burger King marketing mantra, “Have it your way.”

 Although the original surveillance of the Burger King area was by unmarked cruisers, when the plain clothes officers approached the Honda with guns drawn, employees of Burger King, reasonably apprehensive, called the Swansea Police Department which dispatched marked cruisers to quell what appeared to be a nascent gun battle.

 Defendant challenges the admissibility of the comment on “fruits” grounds and has expressly eschewed a Miranda attack.