### STATE OF CONNECTICUT *v.* JUDSON BROWN
### (11470)

PETERS, C. J., HEALEY, SHEA, SANTANIELLO and CALLAHAN, Js.

Argued November 12, 1985—decision released January 21, 1986

*Jon L. Schoenhorn,* special public defender, for the appellant (defendant).

*John M. Massameno,* assistant state's attorney, with whom, on the brief, were *Austin J. McGuigan,* former chief state's attorney, *Jerome O'Malley,* former assistant state's attorney, and *John P. Zanini,* legal intern, for the appellee (state).

PETERS, C. J. The principal issue in this appeal is whether the defendant had a reasonable expectation of privacy, protected by the fourth amendment to the United States constitution[1] and article first, § 7, of the

---

[1] The fourth amendment to the United States constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Connecticut constitution,[2] in a rented two-car garage. After a trial to the jury, the defendant, Judson Brown, was convicted of larceny in the first degree, in violation of General Statutes (Rev. to 1979) §§ 53a-119 (2) and 53a-122 (a) (2),[3] and of falsely reporting the theft of a motor vehicle, in violation of General Statutes § 14-198,[4] and was sentenced to a total effective term of imprisonment of from four to eight years. He appeals from this conviction.

The jury could reasonably have found the following facts. On the evening of January 11, 1980, a New Haven police officer discovered a partially stripped, white 1974 Mercedes Benz automobile abandoned in a parking lot. It was owned and had earlier been reported stolen by the defendant. At the time of its discovery, the car was missing a number of parts, including its two front doors and its marker plates. The defendant subsequently retrieved the recovered vehi-

---

[2] Article first, § 7, of the Connecticut constitution provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

[3] At the time of the offense, General Statutes § 53a-119 (2) provided: "Sec. 53a-119. LARCENY DEFINED. A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. Larceny includes, but is not limited to . . . . (2) Obtaining property by false pretenses. A person obtains property by false pretenses when, by any false token, pretense or device, he obtains from another any property, with intent to defraud him or any other person."

At the time of the offense, General Statutes § 53a-122 (a) (2) provided: "LARCENY IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of larceny in the first degree when . . . (2) the value of the property or service exceeds two thousand dollars."

[4] General Statutes § 14-198 provides: "FALSE REPORT. A person who knowingly makes a false report of the theft or conversion of a vehicle to a police officer or to the commissioner shall be fined not more than five hundred dollars or imprisoned not more than six months or both."

cle and filed a claim with his insurer, the Fireman's Fund Insurance Company. After inspecting the car, the insurance company deemed it a total loss, paid the defendant its fair value, and took possession of the car and its title. When the insurance company subsequently had the car sold at auction, the defendant submitted the highest bid to repurchase the car, but never took possession of it. In October, 1980, the police discovered a number of the missing car parts in a garage rented by the defendant. The defendant was subsequently arrested and convicted of larceny.

On appeal from his conviction, the defendant raises two claims of error. He claims that: (1) the evidence presented was insufficient to support the verdict of guilty of larceny; and (2) the trial court should have granted his motion to suppress evidence seized from his rented garage pursuant to a warrant because the seizure was the result of an earlier illegal search. We find no error.

I

The defendant's first claim of error is that the evidence presented at trial was insufficient to support the jury verdict of guilty of larceny in the first degree. The defendant was charged by information with violating General Statutes §§ 53a-119 (2) and 53a-122 (a) (2) by *obtaining* over $2000 from the Fireman's Fund Insurance Company by fraud. The defendant concedes that there was sufficient evidence to establish that he had filed a claim with the Fireman's Fund Insurance Company and that it in turn had issued checks payable to him in excess of $2000. He argues, however, that there was no evidence that he ever actually *received* either the checks or the money. Since obtaining the money is an essential element of the crime of larceny in the first degree, the defendant claims that his conviction on this count cannot stand. The defendant properly

raised this claim before the trial court by a timely motion for acquittal which was denied.

Appellate review of such a claim requires us to undertake a two step analysis. "We first review the evidence presented at the trial, construing it in the light most favorable to sustaining the jury's verdict. We then determine whether, upon the facts thus established and the inferences reasonably drawn therefrom, the jury could reasonably have concluded that the cumulative effect of the evidence established guilt beyond a reasonable doubt." *State* v. *Sinclair*, 197 Conn. 574, 576, 500 A.2d 539 (1985); *State* v. *Cimino*, 194 Conn. 210, 211, 478 A.2d 1005 (1984). In this analysis, we make no distinction in probative force between direct and circumstantial evidence. *State* v. *Sinclair*, supra; *State* v. *Stepney*, 191 Conn. 233, 255, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 772, reh. denied, 466 U.S. 954, 104 S. Ct. 2163, 80 L. Ed. 2d 547 (1984). "It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence." *State* v. *Perez*, 183 Conn. 225, 227, 439 A.2d 305 (1981).

We conclude that the evidence presented was sufficient to support the jury's verdict. At trial, the state presented the following evidence relevant to this issue. After the defendant's 1974 Mercedes Benz automobile had been recovered with parts missing, the defendant retrieved it, brought it to his home and filed a claim with his insurer. In settlement of the claim, the insurance company declared the car a total loss and issued checks payable to the defendant and to the first lienholder on the car in the aggregate amount of $12,265.50, the fair market value of the car. After paying the defendant's claim in full, the insurance company received title to the car from the defendant, took

possession of the car, and, pursuant to its regular practice in such cases, turned it over to a salvage company.

In light of this evidence, we conclude that the trial court properly denied the defendant's motion for acquittal. The jury could reasonably have concluded that the checks issued to the defendant had been received by him, and that he would not have turned over the car and its title to the insurance company if he had not received payment for it. The fact that other, more direct evidence on this issue might have been produced by the state, as the defendant suggests, does not in any way diminish the validity of the jury's verdict. The jury considered the evidence as presented and drew a reasonable inference from it. Construed in the light most favorable to sustaining the verdict, the evidence was sufficient to support the jury's conclusion.

## II

The defendant's next claim of error maintains that evidence seized from his rented garage pursuant to a search warrant should have been suppressed because the affidavit which supported the warrant had been tainted by an earlier illegal warrantless search. During the trial, the defendant moved to suppress this evidence.[5] Testimony which preceded this motion established the following relevant facts. In August, 1980, a state police officer investigating a matter unrelated to the present case went to the defendant's residence to interview him. At the time, the defendant was renting a second floor apartment in a two-family house. Another tenant lived in the first floor apartment. After

[5] We reject the state's argument that the defendant waived his right to make this claim because he had failed to object to earlier testimony by the police officer concerning the circumstances of his observation of the interior of the garage. See State v. Girolamo, 197 Conn. 201, 207–208, 496 A.2d 948 (1985).

receiving no answer at the front door, the police officer walked to the rear of the house and knocked on the back door. Again receiving no response, the police officer walked to a two-car garage on the property located approximately thirty feet behind the house. After calling out the defendant's name and knocking on the garage door without receiving any response, the officer looked through one of the windows in the garage door to see if "there might have been somebody inside." Although he saw no one there, he did notice "several white doors that appeared to be from a Mercedes and other auto parts." The officer then left the premises. Approximately two months later, on October 21, 1980, after further investigation, the police officer prepared an application for a search and seizure warrant to search the defendant's garage. One fact used to establish probable cause in the application was the officer's earlier observation of the white doors and auto parts in the defendant's garage.[6]

The defendant argues that the police officer's initial observation of the auto parts through the garage window violated the defendant's reasonable expectation of privacy in the interior of the garage and thus constituted a warrantless search without justification. Because the probable cause supporting the warrant was based in part on this illegal search, the defendant argues that all tangible evidence seized pursuant to the warrant should have been suppressed. At trial, in denying the defendant's motion to suppress this evidence, the trial court found that the defendant did not have a reasonable expectation of privacy in the garage. Such findings by a trial court will not be upset unless they

[6] The warrant application refers to a view of the garage by the police officer on September 4, 1980, at which time he spoke to the defendant. It does not contain a reference to the view in August, 1980, which is at issue here. In view of our disposition of this claim, there is no reason to address the discrepancy.

are "legally or logically inconsistent with the facts found or unless they involve application of an erroneous rule of law material to the case." *Dotson* v. *Warden,* 175 Conn. 614, 619, 402 A.2d 790 (1978).

For the defendant to prevail on his claim we must resolve three issues in his favor: (1) that the defendant had a reasonable, constitutionally protected expectation of privacy in the two-car garage; (2) that the police officer's action in looking through the window violated that expectation and constituted an illegal search; and (3) that this illegality tainted the subsequent warrant. Because we conclude that the defendant cannot prevail on the first of these issues, we need not address the latter two.

The defendant's claim that he had a constitutional right to suppression of incriminating evidence depends upon a showing that the challenged search by the police violated the defendant's rights under the fourth amendment to the United States constitution or article first, § 7, of the Connecticut constitution. Because the constitutional prohibition against unreasonable searches and seizures affords protection only against invasions of reasonable expectations of privacy; *Rakas* v. *Illinois,* 439 U.S. 128, 143, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978), reh. denied, 439 U.S. 1122, 99 S. Ct. 1035, 59 L. Ed. 2d 83 (1979); *Katz* v. *United States,* 389 U.S. 347, 361, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) (Harlan, J., concurring); *State* v. *Zindros,* 189 Conn. 228, 236–39, 456 A.2d 288 (1983), cert. denied, 465 U.S. 1012, 104 S. Ct. 1014, 79 L. Ed. 2d 244 (1984); our threshold inquiry is whether the defendant in fact possessed a reasonable expectation of privacy in the garage. *Dow Chemical Co.* v. *United States,* 749 F.2d 307, 311–12 (6th Cir. 1984); *United States* v. *Bellina,* 665 F.2d 1335, 1339 (4th Cir. 1981). Absent such an expectation, the subsequent police action has no constitutional ramifications.

The burden is on the defendant to prove that he had a reasonable expectation of privacy in the place that he alleges to have been unconstitutionally searched. *Rawlings* v. *Kentucky,* 448 U.S. 98, 104–105, 100 S. Ct. 2556, 65 L. Ed. 2d 633 (1980); *Rakas* v. *Illinois,* supra, 130 n.1; *United States* v. *Gomez,* 770 F.2d 251, 253 (1st Cir. 1985); *United States* v. *Torres,* 720 F.2d 1506, 1510 (11th Cir. 1983); *United States* v. *Bellina,* supra, 1340; *United States* v. *Arboleda,* 633 F.2d 985, 992 (2d Cir. 1980); *State* v. *Callari,* 194 Conn. 18, 23, 478 A.2d 592, cert. denied, 469 U.S. 1210, 105 S. Ct. 1178, 84 L. Ed. 2d 327 (1984); *State* v. *Ford,* 71 N.C. App. 748, 751, 323 S.E.2d 358 (1984); *Abell* v. *Commonwealth,* 221 Va. 607, 614, 272 S.E.2d 204 (1980). To sustain his burden in this case, the defendant must prove first, that he had an actual subjective expectation of privacy in the garage and, second, that his expectation was reasonable under the circumstances. *Rakas* v. *Illinois,* supra, 143; *Katz* v. *United States,* supra; *State* v. *Zindros,* supra, 239.

Whether a defendant has established the reasonableness of his expectation of privacy requires a fact-specific inquiry into all the relevant circumstances. *Oliver* v. *United States,* 466 U.S. 170, 177–78, 104 S. Ct. 1735, 80 L. Ed. 2d 214 (1984); *Go-Bart Importing Co.* v. *United States,* 282 U.S. 344, 357, 51 S. Ct. 153, 75 L. Ed. 374 (1931); *State* v. *Zindros,* supra, 239–40. Although "the Fourth Amendment protects people, not places"; *Katz* v. *United States,* supra, 351; expectations of privacy in some places are afforded greater constitutional legitimacy than in others. *Oliver* v. *United States,* supra, 180–81 (no expectation of privacy in open fields); *United States* v. *Chadwick,* 433 U.S. 1, 12, 97 S. Ct. 2476, 53 L. Ed. 2d 538 (1977) (lesser expectation of privacy in automobile); *United States* v. *Bellina,* supra, 1341 (lesser expectation of privacy in airplane). Privacy expectations are normally highest and are accorded the

strongest constitutional protection in the case of a private home and the area immediately surrounding it. *Oliver* v. *United States,* supra, 178. Even in a private home, however, there is no absolute protection of privacy. "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz* v. *United States,* supra. Objects or activities located within a home which are visible to others in areas expressly or impliedly open to the public are not accorded fourth amendment protection because any privacy expectation in such exposed areas would be unreasonable. *Lorenzana* v. *Superior Court,* 9 Cal. 3d 626, 629, 511 P.2d 33, 108 Cal. Rptr. 585 (1973); 1 LaFave, Search and Seizure (1978) § 2.3 (c), pp. 301–303.

The search whose constitutionality is questioned in this case occurred in a garage in the proximity of a two-family house. Reasonable expectations of privacy are necessarily diminished in multi-family homes and multi-unit buildings, by virtue of the presence in common areas of other tenants and their visitors; *United States* v. *Holland,* 755 F.2d 253, 255 (2d Cir. 1985); 1 LaFave, supra, pp. 306–309; but such expectations are not entirely extinguished. On the contrary, we recognize that, even in a multi-unit building, an individual tenant may have a constitutionally cognizable expectation of privacy in areas where his use is exclusive, that is, where he has the legal right to control access and to exclude others. See *United States* v. *Holland,* supra, 255–56 (legitimate expectation of privacy of apartment tenant exists only in an area subject to the tenant's exclusive control); *United States* v. *Arboleda,* supra, 991 (apartment dweller's legitimate privacy expectation exists in area where tenant has the right to exclude others); *State* v. *Ragsdale,* 381 So. 2d 492, 497 (La. 1980) (apartment dweller had reasonable expectation of privacy in completely enclosed patio outside his

apartment unit); *Commonwealth* v. *Hall*, 366 Mass. 790, 794–95, 323 N.E.2d 319 (1975) (tenant has expectation of privacy in areas over which he can control access).

In the present case, however, the defendant has failed to sustain his burden of establishing that he had a legitimate privacy interest in the rented, two-car garage. The garage was rented by the defendant in conjunction with his rental of the second floor of the appurtenant two-tenant house. The defendant presented no evidence to show that his use of this garage was exclusive or that he exercised sole control over it. He established only that he rented the garage and that he had access to it.[7] There was no evidence that his rental included both bays of the garage. There was likewise no evidence whatsoever concerning the relative rights of the landlord, of the first floor tenant, or of visitors to use the garage or the driveway leading up to it. Similarly, there was no evidence concerning the ownership

---

[7] At oral argument before this court, defense counsel repeatedly stated that the record established that the defendant had the exclusive use of the garage. A review of the record provides no support for this claim. Counsel referred the court to testimony by the owner of the apartment house and garage:

"Q. . . . Mr. Brazzell, do you own a property at 51 Frank Street in New Haven?

"A. Yes, I do.

"Q. And what [does] that property consist of?

"A. It consists of a two-car garage, a two-family house.

"Q. Do you rent that property?

"A. Yes, I do.

"Q. And to whom do you rent it?

"A. To Judson Brown."

Additionally, later testimony by the police officer revealed that, in September, 1980, the defendant "told me he had access to the garage."

In view of testimony that someone other than the defendant occupied the first floor of the apartment house, the above statements can best be described as ambiguous. The trial court reasonably could have concluded that this evidence falls far short of establishing that the defendant had sole and exclusive use of both bays of the two-car garage.

of the car seen in the garage.[8] In short, there was no evidence presented to establish that the defendant could reasonably have expected that objects placed in the garage would remain private.[9]

In denying the defendant's motion to suppress the seized auto parts, the trial court found that the defendant did not enjoy a reasonable expectation of privacy in the garage. In view of the defendant's failure to establish that he was entitled to the exclusive use and control of the garage, we conclude that the trial court did not err in denying the defendant's motion.

There is no error.

In this opinion SHEA, SANTANIELLO and CALLAHAN, Js., concurred.

ARTHUR H. HEALEY, J., dissenting. I do not agree with the majority's resolution of the issue raised by the trial court's denial of the defendant's motion to suppress; I would find that it was error to deny the motion to suppress.

---

[8] The police officer testified that, when he looked into the garage in August, he saw a "vehicle." However, he stated that he did not know who owned it. There was no further testimony concerning the ownership of this particular vehicle.

[9] The defendant also claims that his rights were violated because the garage was part of the curtilage of the house and thus entitled to special fourth amendment protection. The common law concept of curtilage, however, does not provide a separate basis for fourth amendment protection. It simply refers to areas immediately surrounding the home in which expectations of privacy are normally the greatest. Curtilage has been defined "by reference to the factors that determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private." *Oliver* v. *United States,* 466 U.S. 170, 180, 104 S. Ct. 1735, 80 L. Ed. 2d 214 (1984). The focus remains the reasonable expectation of privacy which an individual possesses in the area. Our finding that the defendant failed to establish that he had a reasonable expectation of privacy in the garage defeats his claim regardless of how it is labeled.

I recognize, as I must, that the defendant had the burden on his motion to suppress of demonstrating a legitimate expectation of privacy which, in turn, is the necessary predicate to his claim of the violation of his fourth amendment rights. See, e.g., *State* v. *Morrill,* 197 Conn. 507, 542, 498 A.2d 76 (1985). I, however, also recognize that the determination of whether a person has exhibited a subjective expectation of privacy requires a factual determination in each particular case; *State* v. *Zindros,* 189 Conn. 228, 239–40, 456 A.2d 288 (1983), cert. denied, 465 U.S. 1012, 104 S. Ct. 1014, 79 L. Ed. 2d 244 (1984); and that this court does not find facts. Care must be taken, therefore, to examine whatever findings of fact that the trial court actually made in its decision to deny the motion to suppress.

The majority indicates that testimony which preceded the motion to suppress established the "facts" referred to by them. There was, however, additional testimony before the court when it denied this motion which I deem relevant to its disposition. In August, 1980, when the state police officer went to the defendant's residence to interview him, and a woman who apparently resided there with him, he did so "in regard to a possible insurance fraud." At that time, he was *"the* Auto Theft Investigator for the State Police." (Emphasis added.) Prior to his visit to the defendant's home, he had already been to an automobile recovery service that contracts with insurance carriers to sell for a fee recovered stolen or "totaled" motor vehicles. His visit to the service was in regard to "another case that [he] had been working on . . . . " While there, the man who ran the recovery service "pointed out a white Mercedes and told [the state police officer that] it belonged to Judson Brown." This was admittedly significant to this officer because, as he testified, "the vehicle had been stolen and after it was recovered [this recovery service] had got it and apparently Mr. Brown was trying

to buy back the shell of the vehicle." When he went to the defendant's residence in August, 1980, he also had information from the New Haven police department that the defendant had reported his Mercedes stolen.

There were two doors at the front of the house in which the defendant resided. After having received no response when he knocked on one of the front doors, he knocked on the other door. A person answered and the officer ascertained that the defendant, as well as the woman he wished to interview, lived on the second floor. That person did not know at that time if the defendant and the woman were at home. The officer then went to the rear door and knocked. After receiving no response, he "went back and looked into the garage to see if anybody was back there." When he got to the garage, he "hollered" the names of the defendant and the woman he was seeking and he "knocked" on the door of the garage. Receiving no response, he thereafter looked in through the window. He just looked through the garage window because he "thought there might have been somebody inside." In doing so, he not only saw a motor vehicle but also "several white doors that appeared to be from a Mercedes and other auto parts." These were of "significance" to him because of the earlier information he had received, particularly that from the recovery service. He then left the premises and did not return until sometime in the following month.

At the trial, the defendant argued that the officer, "at the time he made [the] observation" through the garage window, did not have the consent of Alphonso Brazzell, the owner of the property, or of the defendant to go back and look into the garage. The defendant further claimed that he had a reasonable expectation of privacy as to items in that garage. He argued that, therefore, the officer's action at that time constituted a violation of

his fourth amendment right to be free from any unreasonable search and seizure. An examination of the only affidavit[1] attached to the application for the search warrant does not reflect at all the fact that the police officer had observed these same white doors and auto parts in August, 1980, when the defendant was not present. The transcript reveals that the theory upon which the motion was argued before the trial court was based on the propriety of the officer's action in August, 1980, and not September, 1980. Both the state and the defendant presented the motion to the court in that posture and the court decided it on that basis. We should, therefore, rule on this issue on the same basis as it was presented, argued and decided in the trial court. See *State* v. *McKnight,* 191 Conn. 564, 578 n.14, 469 A.2d 397 (1983); *Machiz* v. *Harman,* 146 Conn. 523, 525, 152 A.2d 629 (1959). I cannot agree with the majority that the reference in the affidavit to a view of the garage by the officer in September, 1980, and a complete omission in the affidavit of the August, 1980 view is a mere "discrepancy" which there is no reason to address.

The majority points out that the trial court found that the defendant did not have a reasonable expectation of privacy in the garage and that "[s]uch findings by a trial court will not be upset unless they are 'legally or logically inconsistent with the facts found or unless they involve application of an erroneous rule of law material to the case.' *Dotson* v. *Warden,* 175 Conn. 614, 619, 402 A.2d 790 (1978)." See also *State* v. *Zindros,* supra, 242.[2] The majority, citing certain testimony of

---

[1] On this record, it appears that the only affidavit attached to the application for the search warrant was that of the state police officer who was at the defendant's premises in August, 1980.

[2] *Dotson* v. *Warden,* 175 Conn. 614, 619, 402 A.2d 790 (1978), articulated the standard of review before we announced our "clearly erroneous" standard in *State* v. *Zindros,* 189 Conn. 228, 456 A.2d 288 (1983), cert. denied, 465 U.S. 1012, 104 S. Ct. 1014, 79 L. Ed. 2d 244 (1984). Practice Book § 3060D had not been promulgated at the time Dotson was decided.

Brazzell, the owner of the premises, concludes that the defendant has failed to sustain his burden of establishing that he had a legitimate right of privacy interest in the rented two-car garage. It goes on to maintain that the garage was rented by the defendant in conjunction with his rental of only the second floor of the appurtenant two-tenant house. I submit that neither Brazzell's testimony nor any testimony on the motion to suppress establishes that fact and, moreover, the trial court made no such finding and the majority points to no such finding by the trial court because there is none. Brazzell, prior to testifying to his rental to the defendant, said that he had been a partner with the defendant in certain other New Haven real estate. Although that partnership did not include the premises involved here, it serves to implement an interpretation, other than the majority's, of the nature of the defendant's tenancy on the subject premises. Brazzell, after describing the locus in quo as consisting of "a two-car garage, a two-family house," was then immediately thereafter asked by the state: "Do you rent *that* property?" (Emphasis added.) He answered: "Yes, I do." He was then asked: "And to whom do you rent *it?*" (Emphasis added.) He answered: "To Judson Brown." The trial court made no finding that demonstrates that Brazzell rented only one floor and one bay of the garage to the defendant; it made no finding specifically as to whom what was rented and there is no evidence referred to, on the motion to suppress, except that Brazzell rented "that property" (a two-car garage and a two-family house) to the defendant. I, therefore, differ with the majority's statements that *all* the defendant established was that he rented the garage and that he had access to it; the court made no such finding. Insofar as the majority maintains that there was "no evidence whatsoever that his rental includes both bays of the garage," I submit that, in the absence of a find-

ing, Brazzell's testimony about what he rented to the defendant[3] can reasonably only be construed to mean the whole garage. Viewed in this fashion, the defendant's possession and control of the house and the garage are much more enhanced constitutionally than the majority would concede. This is not a technical conveyancing argument; Brazzell simply said that he rented the property, a two-family house and a two-car garage, to the defendant. He did not say he rented one floor and one garage. This uncontradicted testimony adds a new dimension to the analysis.

I agree with the majority when they say that in order for the defendant to prevail on his claim, three issues must be resolved in his favor: (1) that the defendant had a reasonable, constitutionally protected expectation of privacy in the "two-car" garage; (2) that the police officer's action in looking through the window violated that expectation and constituted an illegal search; and (3) that this illegality tainted the subsequent warrant. Unlike the majority, I believe all three of these issues must be addressed.

With reference to the first issue, this defendant did, as a matter of law, demonstrate that he had an actual subjective expectation of privacy in the garage and that his expectation was reasonable under the circumstances. Justice Harlan's formulation of the expectation of privacy test in *Katz* v. *United States,* 389 U.S. 347, 361, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967), is that most frequently applied since *Katz.* While it speaks of a subjective expectation of privacy, the actual exhibition of that "subjective expectation" is judged by objective standards. See, e.g., *United States* v. *Brock,* 667 F.2d 1311, 1320 n.8 (9th Cir. 1982); *United States* v. *Sledge,* 650 F.2d 1075, 1077 (9th Cir. 1981). The garage

---

[3] Brazzell did not testify nor was he asked if the first floor tenant rented directly from him or from the defendant.

itself was on property rented to him, according to the uncontradicted testimony. I recognize that "common law property concepts are not particularly illuminative of Fourth Amendment problems"; *United States* v. *Johnson,* 561 F.2d 832, 841 n.10 (D.C. Cir.), cert. denied, 432 U.S. 907 , 97 S. Ct. 2953, 53 L. Ed. 2d 1080 (1977); "[b]ut at least with respect to the home and the surrounding curtilage the protections traditionally accorded from the time of the common law have bearing on the inquiry as to reasonable expectation of privacy." Id., 845 (Leventhal, J., concurring). Indeed, the United States Supreme Court has only recently reaffirmed this principle. *Oliver* v. *United States,* 466 U.S. 170, 104 S. Ct. 1735, 80 L. Ed. 2d 214 (1984). The garage itself, whether or not part of its structure could be seen from the street, was on a nonpublic portion of property that the defendant rented. "The [Fourth] Amendment reflects the recognition of the Founders that certain enclaves should be free from arbitrary government interference. . . . Thus, courts have extended Fourth Amendment protection to the curtilage [the land immediately surrounding and associated with the home]; and they have defined the curtilage, as did the common law, by reference to the factors that determine whether an individual reasonably may expect that an area immediately adjacent to his home will remain private." (Citations omitted.) *Oliver* v. *United States,* supra, 178–80. Garages have been accorded such protection. See, e.g., *Bies* v. *State,* 76 Wis. 2d 457, 251 N.W.2d 461 (1977). The garage was not a step or two or three from the rear door of the house, but was approximately thirty feet back away from the house in the rear of the premises. The garage itself was closed, reflecting a reasonable expectation of privacy as to the interior of the garage. Id. A vehicle was in it. There was absolutely no evidence at all of any activity, voices

or otherwise, in or about the garage that caused the officer to exceed the area of permissible invitation on the premises and traverse those approximately thirty feet to do what he did when he got there. I recognize that, ordinarily, an officer of the law who goes onto private property, while investigating a crime, is not a trespasser. See, e.g., *United States* v. *Knight,* 451 F.2d 275 (5th Cir. 1971), cert. denied sub nom. *Grubbs* v. *United States,* 405 U.S. 965, 92 S. Ct. 1171, 31 L. Ed. 2d 240 (1972). I also agree that an officer's entry into private property for the purpose of a general inquiry or interview is generally proper. See, e.g., *United States* v. *Brown,* 457 F.2d 731 (1st Cir.), cert. denied, 409 U.S. 843, 93 S. Ct. 42, 34 L. Ed. 2d 82 (1972). However, where an officer steps out of that status, in the absence of exigent circumstances; see *United States* v. *Van Dyke,* 643 F.2d 992, 993 (4th Cir. 1981); and travels thirty feet to a closed garage situated in the rear of the house lot, that privileged status is lost. Especially is this true where, as stated, there was no activity of any sort to suggest remotely that a person or persons were in that garage.

"[P]roperty rights reflect society's explicit recognition of a person's authority to act as he wishes in certain areas and therefore should be considered in determining whether an individual's expectations of privacy are reasonable." *Rakas* v. *Illinois,* 439 U.S. 128, 153, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978). The common law property right to exclude others from, at the very least, that portion of the property to which the public is not invited creates a legitimate expectation of privacy that merits protection. Certainly this defendant had a property right in the closed garage and its approaches, at least from the rear of the house, that was superior to the public and to this police officer, who was not operating under exigent circumstances. I recognize that "[u]ndoubtedly, the test of

'reasonable expectation of privacy' has to be addressed in any evaluation of a police officer's entry onto private property." *United States* v. *Johnson, supra*, 851. When one asks what more could have reasonably been done by the defendant to exhibit an actual subjective expectation of privacy in this garage, which itself is an expectation that society is prepared to recognize as reasonable, one is indeed sorely pressed.

When the officer looked in the garage window after having received no response to his knock or to his hollering, he violated that reasonable expectation and, vantaged as he was, what he saw constituted a search in violation of the fourth amendment. Simply put, he was not properly where he was when he saw what he did through the garage window. Whatever license he had to be on the premises no longer existed at that time and place, and he was, as a matter of law, within the fair intendment of the fourth amendment, a trespasser. The state's argument at trial that the "plain view" doctrine was applicable, therefore, lacks merit if for no other reason than that the officer did not have a legally cognizable justification to be in the position from which his view was taken. *Coolidge* v. *New Hampshire,* 403 U.S. 443, 91 S. Ct. 2022, 29 L. Ed. 2d 564, reh. denied, 404 U.S. 874, 92 S. Ct. 26, 30 L. Ed. 2d 120 (1971); *State* v. *Altrui,* 188 Conn. 161, 179, 448 A.2d 837 (1982); see *State* v. *Onofrio,* 179 Conn. 23, 39, 425 A.2d 560 (1979). This was a "search" as that "occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States* v. *Jacobsen,* 466 U.S. 109, 113, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984); cf. *State* v. *Onofrio, supra.* This warrantless search, therefore, did not fall within those fourth amendment exceptions which are "jealously and carefully drawn." *Jones* v. *United States,* 357 U.S. 493, 499, 78 S. Ct. 1253, 2 L. Ed. 2d 1514 (1958).

An examination of the officer's affidavit attached to the application for the search warrant that was ultimately issued, after a later interview in September, 1980, by this officer with the defendant, discloses the focal nature of the information acquired by the fourth amendment violation in August, 1980, and not September, 1980, as elucidated above. In my view it so tainted the search warrant that the physical evidence in fact obtained because of it should have been suppressed.

As addressed above, the test of "reasonable expectation of privacy" has to be addressed in any evaluation of a police officer's entry onto private property. It is also undoubtedly true that "[i]f policemen are to serve any purpose of detecting and preventing crime by being out on the streets at all, they must be able to take a closer look at challenging situations . . . ." *Dorsey* v. *United States*, 372 F.2d 928, 931 (D.C. App. 1967); see *Commonwealth* v. *Cavanaugh*, 366 Mass. 277, 281, 317 N.E.2d 980 (1974). This case, especially in the complete absence of exigent circumstances, did not constitute that type of challenge, resulting as it did in a fourth amendment violation. "When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent." *Johnson* v. *United States*, 333 U.S. 10, 14, 68 S. Ct. 367, 92 L. Ed. 436 (1948); *United States* v. *Knotts*, 460 U.S. 276, 282, 103 S. Ct. 1081, 75 L. Ed. 2d 55 (1983). The failure to suppress in this case is "to procure an eminent good [i.e., crime prevention] by means that are unlawful, [and] is as little consonant to private morality as to public justice." *Carroll* v. *United States*, 267 U.S. 132, 163, 45 S. Ct. 280, 69 L. Ed. 543 (1925) (McReynolds, J., dissenting).

I, therefore, dissent and would find error in the denial of the defendant's motion to suppress.