******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ESPINOSA, J., dissenting. I disagree with the majority that the police conducted a search of the condominium unit in which the defendant, Dennis Kono, resided in violation of article first, § 7, of the Connecticut constitution by using a police dog to sniff in the shared hallway of the condominium complex. In order for the majority's rationale to be persuasive—under either the federal or state constitutions—it must establish either one or both of the following propositions: (1) dogs are the equivalent of sophisticated sense enhancing technology, not available to the general public; see *Kyllo* v. *United States*, 533 U.S. 27, 40, 121 S. Ct. 2038, 150 L. Ed. 2d 94 (2001); or (2) a shared hallway in a condominium complex constitutes the curtilage of an individual condominium unit. See *Florida* v. *Jardines*, U.S. , 133 S. Ct. 1409, 1415, 185 L. Ed. 2d 495 (2013). The majority has not maintained that the officers entered the defendant's curtilage to conduct the canine investigation. Instead, it has rested its holding on the premise that a police dog is similar to sophisticated electronic surveillance technology, akin to the thermal imaging device that was at issue in *Kyllo*. See *Kyllo* v. *United States*, supra, 29–30. I disagree that dogs, regardless of how well trained they are, should be treated in the same manner as advanced technology for purposes of article first, § 7, of the state constitution and, therefore, I respectfully dissent. Because the defendant's alternative theory, that the shared hallway constitutes curtilage to his condominium unit, would provide an independent basis on which to conclude that the procedure violated article first, § 7, of the state constitution, I also consider that claim and reject it.

In the present case, the police officers acted on information that the defendant was growing marijuana in his condominium unit. On the basis of that information, and with the permission of the property manager of the condominium complex where the defendant lived, they brought a police dog into the common hallway of the building in order to conduct a canine examination of that area.[1] The police never entered the defendant's condominium unit, confining their activities to the common areas of the condominium complex. Under these facts, I conclude that the police did not conduct a search of the defendant's condominium unit under either the federal or state constitutions.

The majority correctly observes that in determining whether the police have conducted a search under article first, § 7, of the state constitution, this court applies the same analytic framework that would be applied under the federal constitution. See *State* v. *Davis*, 283 Conn. 280, 310, 929 A.2d 278 (2007). Accordingly, like the majority's analysis, much of my discussion consid-

ers federal precedent.

Police dogs occupy a unique position in search and seizure jurisprudence. The United States Supreme Court has held that a dog sniff is "sui generis." *United States* v. *Place*, 462 U.S. 696, 707, 103 S. Ct. 2637, 77 L. Ed. 2d 110 (1983). In rejecting claims that dog sniffs constituted searches, the court has examined whether the police conduct at issue "compromise[d] any legitimate interest in privacy . . . ." (Internal quotation marks omitted.) *Illinois* v. *Caballes*, 543 U.S. 405, 408, 125 S. Ct. 834, 160 L. Ed. 2d 842 (2005). A person has a legitimate interest in privacy in an area or item if that person has "exhibited an actual (subjective) expectation of privacy and, second . . . the expectation [is] one that society is prepared to recognize as reasonable." (Internal quotation marks omitted.) *Katz* v. *United States*, 389 U.S. 347, 361, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) (Harlan, J., concurring). Applying this test, the court has explained that it is "aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure." *United States* v. *Place*, supra, 707. A dog sniff does not yield detailed information and does not "expose noncontraband items that otherwise would remain hidden from public view," it discloses only the presence or absence of contraband. Id. Because of the uniquely limited scope of a canine investigation, the court has held that dog sniffs of luggage at an airport and of a motor vehicle during a traffic stop do not constitute searches for purposes of the fourth amendment. See id. (canine sniff of luggage at airport did not constitute search); *Illinois* v. *Caballes*, supra, 408 (canine sniff of motor vehicle during traffic stop did not constitute search). The sole context in which the Supreme Court has held that a dog sniff constituted a search was when the officers had physically entered the defendant's property, within the curtilage of the home, in order to conduct the examination. See *Florida* v. *Jardines*, supra, 133 S. Ct. 1415, 1417–18. Notably, in *Jardines*, the court expressly declined to rely on the reasonable expectation of privacy test and instead analyzed the defendant's challenge to the procedure under a property based theory of the fourth amendment. Id., 1414, 1417. I will discuss *Jardines* in greater detail later in this dissent.

The majority relies on *Kyllo* v. *United States*, supra, 533 U.S. 27, to conclude that the dog sniff in the present case compromised the defendant's legitimate expectation of privacy. In *Kyllo*, the United States Supreme Court applied the reasonable expectation of privacy test to conclude that the use of a thermal imaging device to determine the amount of heat emanating from the defendant's home constituted a search for purposes of the fourth amendment to the federal constitution. Id., 34–35. Because its focus was on the advance of technology, *Kyllo* did not affect the validity of prior cases that

recognized the "sui generis" nature of the dog sniff. See, e.g., *Illinois* v. *Caballes*, supra, 543 U.S. 408; *United States* v. *Place*, supra, 462 U.S. 707. In fact, in sharp contrast to the manner in which it has regarded the use of dogs in police work, the United States Supreme Court has eyed advancing law enforcement surveillance technology with wariness for decades, leery of the threats that such advances pose to the protections afforded by the fourth amendment. *Kyllo* falls in a long line of cases in which the court has considered the fourth amendment implications of such advances. It is significant that in *Jardines*, the court could have extended *Kyllo* to apply to dog sniffs, bringing police canines within the same line of cases that has considered, inter alia, global positioning system (GPS) tracking devices, thermal imaging devices, helicopters, aerial mapping cameras, airplanes, electronic tracking devices, and wiretaps. See *Grady* v. *North Carolina*, U.S. , 135 S. Ct. 1368, 191 L. Ed. 2d 459 (2015) (GPS tracking device); *United States* v. *Jones*, U.S. , 132 S. Ct. 945, 181 L. Ed. 2d 911 (2012) (GPS tracking device); *Kyllo* v. *United States*, supra, 533 U.S. 27 (thermal imaging device); *Florida* v. *Riley*, 488 U.S. 445, 109 S. Ct. 693, 102 L. Ed. 2d 835 (1989) (helicopters); *Dow Chemical Co.* v. *United States*, 476 U.S. 227, 106 S. Ct. 1819, 90 L. Ed. 2d 226 (1986) (aerial mapping cameras); *California* v. *Ciraolo*, 476 U.S. 207, 106 S. Ct. 1809, 90 L. Ed. 2d 210 (1986) (airplanes); *United States* v. *Karo*, 468 U.S. 705, 104 S. Ct. 3296, 82 L. Ed. 2d 530 (1984) (electronic tracking devices); *Katz* v. *United States*, supra, 389 U.S. 347 (wiretaps). Presented with this opportunity to include police dogs within this category, the court declined to do so. That is because dogs are different from advanced technology.

Advancements in technology trouble the court precisely because they are continually evolving, potentially eroding society's reasonable expectations of privacy. The court has had a dual response to technological developments. On the one hand, the court has attempted to craft rules that are flexible enough to anticipate more sophisticated means of surveillance and investigation that may become available to law enforcement. See, e.g., *Kyllo* v. *United States*, supra, 533 U.S. 36 ("[w]hile the technology used in the present case was relatively crude, the rule we adopt must take account of more sophisticated systems that are already in use or in development"). At the same time, however, the court has recognized that advancements in technology have had an unavoidable and undeniable effect on search and seizure law because they have changed what we may reasonably expect to remain private. For instance, the court observed in *Kyllo* that "[i]t would be foolish to contend that the degree of privacy secured to citizens by the [f]ourth [a]mendment has been entirely unaffected by the advance of technology." Id., 33–34. Similarly, in her concurring opinion in *United*

*States* v. *Jones*, supra, 132 S. Ct. 955, in which the court concluded that the attachment of a GPS tracking device to a vehicle constituted a search, Justice Sotomayor observed that "the same technological advances that have made possible nontrespassory surveillance techniques will also affect the *Katz* test by shaping the evolution of societal privacy expectations."

An example of an area in which reasonable expectations of privacy have been reshaped by advances in technology is aerial surveillance. For example, in *Florida* v. *Riley*, supra, 488 U.S. 448, 450, the court concluded that flying a police helicopter at a height of 400 feet over the defendant's backyard, to look through openings in the roof of the defendant's backyard greenhouse, did not constitute a search. The court acknowledged that the area was within the curtilage of the defendant's home, but key to its analysis was the fact that "private and commercial flight . . . is routine . . . ." (Citation omitted; internal quotation marks omitted.) Id., 450. Accordingly, the court concluded, it was unreasonable for the defendant to expect that the contents of the greenhouse would not be visible from the air. Id.; see also *California* v. *Ciraolo*, supra, 476 U.S. 209, 215 (because private and commercial flight is routine, no search where police chartered plane to fly 1000 feet over defendant's backyard to observe area completely enclosed within high fences).

There is nothing novel about drug sniffing dogs. Domesticated dogs have been a part of our society for centuries, and the power of the canine sense of smell is certainly no secret. Although this court, until now, had never weighed in on the question of when or whether a dog sniff constitutes a search, the court heard claims regarding dog sniffs more than twenty years ago. See *State* v. *Torres*, 230 Conn. 372, 380, 645 A.2d 529 (1994) (declining to reach question of whether dog sniff during traffic stop constituted search because procedure was justified by articulable suspicion). The United States Supreme Court has heard claims challenging dog sniffs as far back as thirty-three years ago. See *United States* v. *Place*, supra, 462 U.S. 696. In other words, the police use of dogs as an investigative tool has been considered within our jurisprudence for many years.

Dogs, unlike technology, are not going to change. As previously noted, the United States Supreme Court has held that a dog sniff is "sui generis." Id., 707. The nature of a dog's sense of smell has not changed over the years and there is no reason to believe that it will evolve in the way that technology does. Therefore, the scope of information yielded by a dog sniff, unlike the information yielded by technological devices, will remain sui generis—that information will always remain limited to indicating merely the presence or absence of contraband. Thus, there is no danger that a dog sniff will evolve to the point of alerting officers to a detail such

as "at what hour each night the lady of the house takes her daily sauna and bath . . . ." *Kyllo* v. *United States*, supra, 533 U.S. 38. Notwithstanding the court's characterization of the thermal imaging device in *Kyllo* as "crude" technology; id., 36; that device yielded much more detailed information than is conveyed by a canine investigation. The court explained that the Agema Thermovision 210 thermal imager used by the police in that case converted "radiation into images based on relative warmth—black is cool, white is hot, shades of gray connote relative differences; in that respect, it operates somewhat like a video camera showing heat images." Id., 29–30. In other words, the police were able to observe images of not only objects, but also of persons, moving about inside the home. There is simply no comparison between that type of device and a police dog.

Moreover, although drug sniffing dogs are highly trained, there is no claim in the present case, nor has the majority contended, that only the police are able to train dogs to respond to particular odors with particular behaviors. Thus, even if a dog is a "device" akin to a thermal imaging device, there has been no showing that it is a device that is somehow unavailable to the general public. I would conclude, therefore, that *Kyllo* is inapplicable to the present case.

The federal decisions on which the majority relies to arrive at the opposite conclusion—that dogs should be treated like advanced technology for purposes of determining whether a procedure constituted a search that compromised a legitimate expectation of privacy—ignore the unique character of a dog sniff, and either predate *Jardines* or gloss over the fact that in *Jardines*, the majority declined to extend *Kyllo* to dog sniffs. Most significantly, the majority relies heavily on the decision of the United States Court of Appeals for the Second Circuit in *United States* v. *Thomas*, 757 F.2d 1359, 1367 (2d Cir. 1985), cert. denied sub nom. *Fisher* v. *United States*, 474 U.S. 819, 106 S. Ct. 66, 88 L. Ed. 2d 54 (1985), and cert. denied sub nom. *Wheelings* v. *United States*, 474 U.S. 819, 106 S. Ct. 67, 88 L. Ed. 2d 54 (1985), and cert. denied sub nom. *Rice* v. *United States*, 479 U.S. 818, 107 S. Ct. 78, 93 L. Ed. 2d 34 (1986), which concluded that a dog sniff of the defendant's apartment from a shared hallway compromised the defendant's reasonable expectation of privacy, primarily on the basis of the court's reasoning that a dog is like a technological device. *Thomas*, however, predated *Jardines*. As I have explained, the United States Supreme Court has *never* treated dogs in the same manner that it has treated technology for purposes of the reasonable expectation of privacy test, and it declined to do so in *Jardines*. Similarly, in another decision relied on by the majority, *United States* v. *Whitaker*, 820 F.3d 849, 852–53 (7th Cir. 2016), the United States Court of Appeals for the Seventh Circuit relies solely on the concurring opinion of Justice Kagan in *Jardines* to con-

clude that *Kyllo* should be extended to dog sniffs, ignoring the majority decision in *Jardines*. I observe that most of the state court decisions relied on by the majority either predate *Jardines* or apply a curtilage analysis rather than the *Katz* reasonable expectation of privacy test. See, e.g., *People* v. *Burns*, 50 N.E.3d 610, 617–22 (Ill. 2016) (applying *Jardines* curtilage inquiry to determine that dog sniff at entrance to defendant's apartment violated fourth amendment).

I further observe that no dog sniff may be analyzed in a vacuum. This dog sniff occurred in the shared hallway of a multiunit building, not a single-family home. That fact is relevant to the defendant's reasonable expectation of privacy, which is analyzed under a very fact centered and common sense inquiry. When one lives in a unit that shares walls, floors and ceilings with other units, and shares the same hallway as others in the building, it would be *unreasonable* to expect the same amount of privacy as that enjoyed in an independent dwelling place. This court has expressly recognized this principle: "Reasonable expectations of privacy are necessarily diminished in [multifamily] homes and [multiunit] buildings, by virtue of the presence in common areas of other tenants and their visitors . . . ." (Citations omitted.) *State* v. *Brown*, 198 Conn. 348, 357, 503 A.2d 566 (1986). The majority's statement, therefore, that the defendant's reasonable expectation of privacy must be treated as though he lived in a single-family dwelling, is not supported by this court's precedent and cannot be reconciled with the facts of the case. The majority's claim is that its fiction is required because otherwise residents of multifamily buildings would enjoy lesser protection under article first, § 7, of the state constitution. That is simply not correct. Each person is protected against searches that compromise a reasonable expectation of privacy. The determination of what is reasonable is necessarily a fact intensive inquiry. Applying all of the relevant facts, including the facts that the procedure involved a dog rather than any advanced technology, and that it occurred in the common area of the condominium complex, I would hold that the defendant had no reasonable expectation of privacy in the odors that emanated into a shared hallway from his condominium unit.

I next consider whether the area of the shared hallway immediately adjacent to the door to the defendant's condominium unit constituted the curtilage of the unit, rendering the dog sniff a search pursuant to *Jardines*. The question is whether the area in front of the defendant's unit is akin to the front porch in *Jardines*. In *Jardines*, the officers walked onto the defendant's front porch with a drug sniffing dog, which sat at the base of the defendant's front door, indicating that it had detected one of the odors to which it had been trained to respond. *Florida* v. *Jardines*, supra, 133 S. Ct. 1413. Under those facts, the court was quite clear that its

conclusion was grounded in the fourth amendment's roots in property rights, specifically the law of trespass, and therefore turned on the fact that the officers had physically intruded on the defendant's property in order to conduct the canine investigation. Id., 1414. Justice Scalia, writing for the majority, explained that "[w]hen the [g]overnment obtains information by physically intruding on persons, houses, papers, or effects, a search within the original meaning of the [f]ourth [a]mendment has undoubtedly occurred." (Internal quotation marks omitted.) Id.

Understood properly, therefore, *Jardines* was not a case about a dog—it was a case about a front porch. The police officers exceeded the limited license enjoyed by the public to enter onto a front porch—the fact that the intrusion involved a dog was not significant. The majority explained that "[i]t is not the dog that is the problem, but the behavior that here involved use of the dog. We think a typical person would find it a cause for great alarm . . . to find a stranger snooping about his front porch *with or without* a dog." (Citation omitted; emphasis in original.) Id., 1416 n.3. The same conclusion would have been required, the majority added, if instead of using a drug sniffing dog, the police had peered into the windows of the home with binoculars. Id. *Jardines* stands only for the narrow proposition that when a police dog sniff occurs on a defendant's property, within the curtilage of the home, the sniff constitutes a search.

"The curtilage area immediately surrounding a private house has long been given protection as a place where the occupants have a reasonable and legitimate expectation of privacy that society is prepared to accept." *Dow Chemical Co.* v. *United States*, supra, 476 U.S. 235. "[T]he [f]ourth [a]mendment protects the curtilage of a house and . . . the extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself. . . . [T]he central component of this inquiry [is] whether the area harbors the intimate activity associated with the sanctity of a man's home and the privacies of life." (Citation omitted; internal quotation marks omitted.) *United States* v. *Dunn*, 480 U.S. 294, 300, 107 S. Ct. 1134, 94 L. Ed. 2d 326 (1987).

The United States Supreme Court has explained that "curtilage questions should be resolved with particular reference to four factors: the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by. . . . We do not suggest that combining these factors produces a finely tuned formula that, when mechanically applied, yields

a 'correct' answer to all extent-of-curtilage questions. Rather, these factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of [f]ourth [a]mendment protection." (Citations omitted; footnote omitted.) Id., 301. The court also has noted, however, that "for most homes, the boundaries of the curtilage will be clearly marked; and the conception defining the curtilage—as the area around the home to which the activity of home life extends—is a familiar one easily understood from our daily experience." *Oliver* v. *United States*, 466 U.S. 170, 182 n.12, 104 S. Ct. 1735, 80 L. Ed. 2d 214 (1984). This court has further observed that application of the four *Dunn* factors involves "two principal questions, objective and subjective . . . (1) whether society would recognize the particular area claimed as within the curtilage of the home; and (2) whether the defendant has manifested a subjective expectation of privacy in that area." (Internal quotation marks omitted.) *State* v. *Ryder*, 301 Conn. 810, 823, 23 A.3d 694 (2011).

Applying these principles to the present case, I conclude that the area immediately outside the defendant's condominium unit did not constitute the curtilage of his unit. Nothing about the common hallway, even in the area outside his door, can be said to "[harbor] the intimate activity associated with the sanctity of a man's home and the privacies of life." (Internal quotation marks omitted.) *United States* v. *Dunn*, supra, 480 U.S. 300. Privacy simply cannot be enjoyed in an area that is a shared space. The sole factor favoring the defendant is the proximity of the area to his home. Proximity alone, however, is not sufficient. If it were, then every public sidewalk that abuts the front of a home would constitute the curtilage of the home. Nothing in the record reveals that there was any enclosure separating this area from the remainder of the shared hallway. Nor is there any suggestion that the area was used for any other purpose than passing through, either by the defendant on the way into and out of his unit, or by other residents and their visitors accessing their respective units. Nor did the defendant ever claim that he took any steps whatsoever to protect the area from observation by people passing by, and indeed it is questionable that he would be able to, given that he did not enjoy exclusive control of that area. Compare *United States* v. *Hopkins*, 824 F.3d 726, 732 (8th Cir. 2016) (area outside front door of defendant's townhome constituted curtilage where door not accessed via common walkway and even his nearest neighbor would not pass near entrance to his unit), with *State* v. *Luhm*, 880 N.W.2d 606, 616–17 (Minn. App. 2016) (area immediately outside defendant's condominium unit did not constitute curtilage where access was by way of shared hallway,

visible to all who walked by, and use of area governed by condominium association rules).

Under these facts, I conclude that the area in the shared hallway immediately outside the defendant's condominium unit did not constitute curtilage. Accordingly, *Jardines* is inapplicable to the present case, and the dog sniff did not constitute a search, either under the fourth amendment of the federal constitution or under article first, § 7, of the state constitution.

I respectfully dissent.

[1] The majority observes that the state has not argued that the police had a reasonable and articulable suspicion that the defendant was growing marijuana plants in his condominium unit, or claimed that if it had, that suspicion would have justified the dog sniff. The explanation is clear. It is the state's position that there was no search of the defendant's condominium unit, either under the fourth amendment of the federal constitution or article first, § 7, of the state constitution. Accordingly, the question of whether the police had a reasonable and articulable suspicion and whether such a level of belief would have been constitutionally sufficient was irrelevant to the state's argument.